(No. 26047.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* MAX MUTTER *et al.* Plaintiffs in Error.

*Opinion filed November 18, 1941.*

COURTNEY ARTHUR, and ARTHUR H. SHAY, for plaintiff in error Max Mutter; JOHN A. BERRY, for plaintiff in error Martin Mutter.

GEORGE F. BARRETT, Attorney General, and TAYLOR E. WILHELM, State's Attorney, (CHARLES A. HELFFRICH, and HARRY L. ARNOLD, of counsel,) for the People.

Mr. JUSTICE FARTHING delivered the opinion of the court:

The brothers, Max and Martin Mutter, were convicted of the crime of arson by a jury in the circuit court of LaSalle county. Martin's wife, Bessie, was tried with them, and acquitted. Max and Martin were represented by separate counsel and have filed separate briefs here. They claim it was error to deny their motions for separate trials.

The building which the People claim was burned by defendants was located on the south side of Main street in Ottawa. It was a two-story brick building to which Bessie Mutter had legal title. On the east side of the first floor, which was about 40 feet wide and 149 feet long, was a grocery store and meat market known as the New Way Market, operated by the Mutters. The west side of the first floor, which extended back only about 65 feet, was

rented to Alton Larson who operated a paint store there. There was a basement under the entire front part of the building but it extended back south only about 65 feet. All of the west side and most of the east side of the basement was occupied by Larson. On the second floor of the building were four apartments, which were furnished and leased by Bessie Mutter. One of these apartments was occupied by Max Mutter. The paint store and the grocery store were completely separated by a partition wall. There were two stairways to the basement, one on the inside of the paint store and one on the outside at the rear of it. The outside one was not locked except by a plank across the doors. There was an outside stairway to the apartments. The only opening from the first floor on the New Way Market side to the basement was a hole about two feet wide which had been cut in the floor and was kept covered by loose boards.

This property was originally owned and a meat market operated thereon by the father of Max and Martin Mutter and, after his death in 1920, by their mother. In 1924, the two sons, Martin and Max, took over the active management of the business. At the time of her death in 1930, their mother had legal title to the premises and also $14,000 in notes secured by a mortgage against the same property. The legal title to the realty and also the $14,000 in notes passed to her three sons, Max, Martin and Carl. In the meantime, on July 14, 1927, Martin Mutter was married to Bessie Mutter, and in August of that year she took over the operation of the New Way Market. At about that time an $8500-chattel mortgage which Max and Martin had executed on the fixtures was foreclosed and Bessie bought the chattels. May 16, 1928, Martin and Max Mutter were adjudicated bankrupt. In 1931, Carl Mutter conveyed to Martin and Bessie Mutter his interest in the realty and also gave them his interest in the notes. Max also conveyed his interest in the realty to Martin and Bessie, and, in the

exchange, became the sole owner of the $14,000 worth of mortgage notes. In 1933, Martin Mutter opened a store in Chicago, financed by Bessie. That proved unsuccessful and December 11, 1935, Martin was again adjudicated a bankrupt.

September 24, 1936, Martin and Bessie Mutter executed a real estate and chattel mortgage on the New Way Market to secure a $17,000-loan from the Reconstruction Finance Corporation. In order to obtain this loan it was necessary for Max Mutter to subordinate his $14,000-mortgage. In 1938, the debt to the Reconstruction Finance Corporation had been reduced to $12,000 and this was refinanced by a new $12,000 mortgage to the First Federal Savings & Loan Association of Ottawa, and at this same time Max released his subordinated mortgage and received a new junior mortgage for $14,000. No interest was ever paid to Max on either mortgage, and he continued to work in the New Way Market. At the time of the fire the Mutters were four or five months in default on payments under the new $12,000-mortgage. Bessie Mutter testified that at the time of the fire she owed a wholesale grocery $2400 and a packing company $3800. Between January 1, 1939, and the date of the fire, May 8, 1939, ten checks of the New Way Market were returned "protested." The house in which Martin and Bessie lived was forfeited for non-payment of taxes. Max owned an undivided two-thirds interest in this property and Bessie the other one-third.

For sometime prior to the fire, all three of the Mutters had been negotiating with the Great Atlantic and Pacific Tea Company to lease it the business property. That company wanted the entire first floor, including the part occupied by the paint store. It wanted the Mutters to make approximately $13,000 worth of improvements. The principal cause of the delay was the Mutters' difficulty in raising the $13,000. The lease was finally executed and possession was to be taken about June 1, 1939, at a rental of .

$325 per month.    Larson had been given notice to vacate his store and he had made arrangements to move two doors west.

The fire in the building was discovered a little after 5:00 o'clock A.M. Monday, May 8, 1939.   Whether it originated in the New Way Market side or in the paint store is a matter of dispute.   Some of the witnesses say they first saw flames coming from the paint store, but that there was lots of smoke in both sides before the flames broke out.   However, the testimony of the firemen shows that the fire started on the New Way Market side.   They conclusively established that there were several small and independent fires in the New Way Market, which had no connection with each other.   In one place was a cheese box filled with papers among which was a carton of penny matches and this had not as yet ignited.   The fires were caused by the burning of boxes or papers.   However, the main fire, the one which caused the burning of the building, came from the south end of the basement under the New Way Store.   There was a "roaring furnace" coming out of the 2-foot hole in the floor.   That it was not coming from the paint store side of the basement was established by proof that the firemen went into that part of the basement to get at the fire under the east side, and by proof that the materials in the west side of the basement were not burned.

The evidence shows that Saturday night before the fire the store closed between 9:00 and 10:00 o'clock.   The stock of groceries was lower than usual and there was little meat.   One of the butchers testified "the stuff" which later burned was not scattered around at closing time Saturday night.   The meat counters were cleaned, the employees left, and Martin Mutter locked the store and left about 11:00 o'clock.   He and Bessie had a sandwich and went home and retired about midnight.   The next day Martin did not leave the house until about 6:00 o'clock P.M., when he went to the store, turned on the ice machine, inspected the coils and

left. He was there about ten minutes and went back home. He went to bed about 10:30 that night and stayed there until he was awakened about 5:30 the next morning by Bessie, who told him of the fire. He then went to the store. He went to the rear of the store, helped the firemen push in the door, which had a spring lock on it and it opened. He corroborated the testimony of the firemen that there were several fires.

A great number of witnesses testified as to the activities of Max on the afternoon and evening preceding and on the morning of the fire. It appears that he spent the greater part of the afternoon in the store and one witness testified his truck was filled with boxes and orange crates. Other witnesses also saw him there from around 9:00 o'clock that night until about 1:00 o'clock. His truck was at the rear of the store and people heard noises which indicated he was loading things in the truck. He made several trips in the truck to and from the rear of the store. One witness said he made about four trips an hour. Two police officers who passed the store that night testified the windows were covered with wrapping paper so as to almost completely obstruct the vision of one looking in, and that they had never noticed the windows so covered before. One night watchman testified that just after he had checked the front doors of the store about 9:00 o'clock and crossed the street, Bessie walked up to the door and shouted: "Max, get the hell outta there!" This was denied by Bessie, and Max says he was not in the store at that time. It was proved by two different milk deliverymen that he was in the rear of the store between 4:30 and 5:00 o'clock the morning of the fire, which broke out shortly after 5:00 o'clock. About 5:30 that morning Max appeared in his truck at the home of William A. Meyer, about four miles from Ottawa, and sounded his horn. He asked Meyer to take him to Ottawa in Meyer's car and said he wanted to get the Chicago Motor Club to come out and fix the truck. According to Meyer,

Max did not say what was the trouble with the truck and did not do anything in Meyer's presence to try to fix it. When they reached Ottawa, Max said he had forgotten his keys to the store and asked Meyer to drive by Martin's house. Max went in and came back out in a few minutes. When they were within four or five blocks of the New Way Market Max said: "Looks like if there is a fire," and when a little closer said: "My God, it looks like it is close to our place." Meyer drove him to the store, Max got out, and Meyer drove back home. According to Mrs. Meyer there were two barrels and about twelve or fifteen boxes in Max's truck. She testified that about 8:00 or 8:30 that morning, Max and Martin came out to get the truck, Max got in and started it, and "I don't think it took any longer than anyone else starting a car would ordinarily take." According to Martin, Max lifted up the hood and worked on the car a few minutes. It will be noted that there was no further mention of the Chicago Motor Club after Max asked Meyer to take him to town. Meyer had bought some groceries at the New Way Market Saturday night and had taken most of them home, but Max was to deliver the remainder Monday. However, Max did not make the delivery.

About 11:00 o'clock the morning of the fire Max drove to Mendota, Illinois, to a locked storage company operated by Gilbert Truckenrod and said he wanted to store some meat until the next day. He had never done business with that company before. Mr. Herbert, an employee, testified Max said the owner would show up by the time the contents were off the truck, but that the owner never did show up. Herbert told Max he wanted to know whose meat it was by evening and if he did not he would take it out in the alley. Max then wrote down an address. According to Truckenrod and Herbert, there was some lard, and some of the packages were marked "pork loin" and some "steaks." Truckenrod saw two that were open and one

contained lard and the other liver sausage. The next afternoon Max came in a Studebaker sedan and got the packages. Bessie owned a Studebaker sedan.

Max's explanation of his presence at the store and of his activities is that Sunday afternoon before the fire he went to the dock and bought a load of fish, took them to the store and cleaned and cooled them that afternoon, and that night he delivered ten cases of eggs to one company and about 10:30 that night delivered a side of veal and some other meat to a restaurant in Ottawa. He is corroborated as to these deliveries. He denied there was a paper on the windows that night. He testified he went to bed about 1:00 o'clock and got up about 4:30, went to the store, loaded the fish on the truck to take to Chicago, was going to drive to Meyer's to deliver a grocery order, and was going then to the Atlantic & Pacific Fish Company to get some more fish. His car got hot and stopped at Meyer's, he asked Meyer to give him a pull, but Meyer said he had just had the clutch on his car fixed and his car wouldn't pull the truck. Max then asked him to take him back to town so he could get the Chicago Motor Club to come out and work on it. He denied he said anything about forgetting keys or that he went by Martin's house. He said that after Martin took him back out to the truck and he got it started, he drove to Mendota, to Truckenrod's and put the fish and two or three cartons of meat in the storage locker. The following day he took the merchandise to Chicago. It may be pointed out that Mendota is northwest of Ottawa, while Chicago is northeast.

Two investigators for the State's attorney's office testified that they found two sets of scales and a cash register in the garage at Martin's house. Max admitted that he had taken them from the store to the garage Sunday afternoon or evening but said he did so because he was going to take them to Chicago for repairs the next day. The investigators also said they found a large quantity of groceries

and soaps in a cupboard in the basement of Martin's and Bessie's home. Bessie testified there was no more than the usual amount there.

Other evidence is that while the grand jury which indicted him was in session, Max drove to the home of William Lynes, a member of the grand jury, said he knew Lynes was a member of it and "Well, I wish you would do something for me. Do whatever you can." Lynes replied: "Max, I have no way of doing anything for you. There is twenty-three men on that jury." Max then said: "Well, do the best you possibly can and I will make it right with you." This was denied by Max.

A representative of the Federal Hardware Mutual Insurance Company, which had an insurance policy on the New Way Market, testified his company wanted to cancel the policy and retire from the risk, and May 3, 1939, he told Bessie he wanted to "pick up" the policy. She replied: "What the hell is the matter with that outfit of yours, do they think we're going to have a fire?" He told her the company had had trouble with reinsurance on the risk. He asked her about the "A. & P." lease. She told him to see Max about that. Max was out of town, and the agent said he would be out of town the rest of the week, and Bessie told him to come back Monday or Tuesday. The fire occurred Monday. A sales correspondent of that same company, in the Chicago office, testified Max came to his office May 3 or May 4, 1939, to see about some changes in a dwelling policy. According to this witness Max said the Great Atlantic and Pacific Tea Company wanted so many improvements they were going to get along without it and that the deal was off. Actually the lease had been executed at that time. Max asked how losses were running, and Mainland (the representative) replied it was a period of depression and in such periods losses were always above normal. This testimony is contradicted by Max.

There was a total of $43,000 fire insurance on the New Way Market, and there is testimony the fair cash value of it was about $25,000. Also, in their proof of loss, the Mutters claimed the refrigeration unit was worth about $16,000 and there is testimony by the person who installed it twenty years ago that it was obsolete and of no value. There is also evidence that they claimed to have lost more groceries than there were in the store at the time of the fire. On these questions the evidence is conflicting.

Counsel for defendants seek to argue the question of Alton Larson's guilt. This argument will be noticed only briefly. Alton Larson was not tried and there is little evidence relating to him. The circumstances in evidence with respect to him show no more than a possibility that he might have set the fire, and are not sufficient to raise any reasonable doubt as to the guilt of the defendants.

The evidence above set forth demonstrates that the People have failed to prove Martin Mutter guilty beyond a reasonable doubt. Throughout the evidence on behalf of the People he is hardly mentioned, except on the questions of title and his family and business relationships with the other two defendants. And throughout all the evidence there is nothing to indicate that Martin himself actually did the work of setting the fire, was even present at the time of its preparation, or that he helped plan it. And there is nothing in his conduct after the fire was started to prove his guilt. Though the jury may have believed his testimony that Max worked on the truck when they went out to Meyer's to get it was false, it still does not show he participated in the setting of the fire. The rule is that to constitute one guilty of a crime he must be present or participate or do some act at the time of the commission of the offense in furtherance of the common design, or if not present, it must be shown that he by some affirmative act actually advised, encouraged, aided or abetted the perpe-

tration of the crime. (*People* v. *Richie*, 317 Ill. 551; *People* v. *Buxton*, 362 id. 157.) Here there is no such proof. Merely to show he was husband of the legal owner and brother of Max, and that he worked in the store, plus proof that Max had stored two scales and a cash register in his garage and that there were some groceries in his basement, is not sufficient to prove he, by affirmative act, actually advised or aided the perpetration of the crime. Since it does not appear there are other witnesses available than those who have already testified, the judgment as to Martin. will be reversed without remandment. *People* v. *Bradley*, 375 Ill. 182.

On the other hand, the proof of Max Mutter's guilt is so conclusive that we would not be warranted in disturbing the finding of the jury. His conduct both before and after the fire, in view of all the circumstances is inconsistent with innocence, and his testimony, which is largely uncorroborated, is not plausible. He was at the store practically the entire afternoon and evening preceding the fire and until at least 1 :00 o'clock the following morning, and was again there by 4:30 the same morning. His only explanation is that he was cleaning and cooling fish, and this is uncorroborated. No one else mentions that there was any fish or any boxes marked "fish" in the cartons he took to Mendota; instead meat and lard were seen and other cartons were marked as containing different kinds of meat. Though several witnesses said Max was constantly loading the truck and driving away that night, his only explanation is that he made two deliveries, both before 10:30 P. M. His testimony that he was on his way to Meyer's to deliver groceries and then on to get some fresh fish and also to deliver cooled and packed fish, is uncorroborated. He did not deliver any groceries or mention them to the Meyers, nor did he say anything at all about fish. It appears that his trouble with his truck that morning was not real. When confronted with proof that two scales and a cash register were found in the Mutter garage, he admitted taking them

there Sunday but said he did so because he wanted to take them to Chicago on Monday. It seems unlikely he would do that instead of loading them directly on the truck when he was ready to leave the store for Chicago. Another circumstance is that he was reluctant to give the storage company at Mendota the name of the owner. It is important that Max Mutter was in the store for such a great length of time prior to the fire and left just before it broke out. A fire planned, as the proof shows this was, in all probability could not have been set by someone else without such person encountering Max. He was proved guilty beyond a reasonable doubt.

Max Mutter contends the court erred in admitting in evidence a certificate of the adjudication in bankruptcy of Martin and himself in 1928. The ground of the objection was that it was too remote. We see no error in the admission of this evidence. It was proper for the People to show the relationship of the parties and the *status* of the title to the New Way Market. To do this it was relevant to show how Bessie became legal owner of the business. She obtained legal title by purchase from the chattel mortgagee and without payment of consideration to Martin or Max Mutter. To do this she used $1500 of her own money and took the remainder from currency out of the business. A few months later Martin and Max were adjudicated bankrupt. In view of this, and the claim of defendants that Bessie was sole owner of the business, and that Martin and Max, as mere employees, would have no motive to burn the building, it was proper to show the insolvency of Martin and Max as a reason for her acquisition of title. By this, and other proof, the People showed Max Mutter did have an interest in the business, and that Bessie obtained legal title only in order that the three of them might continue the business.

Max Mutter complains of the court's denial of his motion for a separate trial, but we find no error in this respect  The general rule is that those indicted jointly shall

be tried together. (*People* v. *Wood,* 306 Ill. 224; *People* v. *Corbishly,* 327 id. 312.) Ordinarily the granting or refusing of a motion for severance is a matter within the sound discretion of the trial court, and unless an abuse of this discretion is shown, a refusal to grant a separate trial is not error. (*People* v. *Kozlowski,* 368 Ill. 124.) Generally, if one defendant makes confessions implicating the other defendant or defendants, a severance should be ordered (*People* v. *Bolton,* 339 Ill. 225) and, likewise, where the defense of one defendant is so antagonistic to the defense of the others that a severance is necessary to insure a fair trial. (*People* v. *Payne,* 359 Ill. 246.) However, neither of those elements is present here. None of the defendants made confessions nor were their defenses antagonistic. Their testimony and their defenses were entirely harmonious. Where the only ground for a severance is that part of the testimony competent against one is incompetent against the other or that separate counsel for one had different ideas about conducting the defense, there is no abuse of discretion in refusing a separate trial. (*Gillespie* v. *People,* 176 Ill. 238.) That is the situation here. Some of the evidence admissible against Bessie was inadmissible against Max. However, in each such instance when requested, the court ruled the evidence was admissible only as to Bessie. The court instructed the jury that the evidence of declarations and statements made by the different defendants should, if believed, be considered only with respect to the defendant or defendants said to have made such declarations or statements, and the court did not abuse its discretion in denying a severance.

Max Mutter also argues that "the court erred in permitting the State's attorney to withhold from counsel for the defendant the purported transcript of the testimony of the defendants before the Fire Marshal from which he asked isolated questions," in the examination of the stenographer who took the testimony. The record shows that

the only demand that the State's attorney submit any transcript was made by the attorney for Martin Mutter and that this was for the transcript of Martin Mutter's testimony alone. The stenographer was asked whether Martin Mutter had been asked certain questions to which he had made specified answers. The questions asked Martin Mutter and the answers he made to them were not damaging to Max Mutter. He is, therefore, in no position to complain. Thus the record does not bear out the contention that permission for counsel for Max Mutter to use the transcript was denied. In a number of instances contentions made by Max Mutter are not accompanied by any references to the abstract of record. This case has an unusually large record, the briefs are also long and the argument is not divided in any manner with the result that we cannot find the argument of respective counsel on a given point without looking through the entire brief. This has caused the work of the court on this case to be unduly tedious and cumbersome. An error of the trial court in admitting a trust deed on the dwelling-house executed by Max Mutter on May 1, 1939, is claimed. No reference is given to the abstract or record and we have been unable to find it in the abstract. This contention will, therefore, not be considered.

It is also urged that the court erred in the giving and refusing of instructions. It would unduly extend this opinion to discuss each of these separately. We have examined them and find no error which would warrant a reversal as to Max Mutter. This is also true of alleged improper remarks of the State's attorney.

The judgment with respect to Max Mutter is affirmed, and as to Martin Mutter it is reversed.

*Affirmed as to Max Mutter;*
*reversed as to Martin Mutter.*