(No. 32956.—)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* IVAN GRILEC, Plaintiff in Error.

*Opinion filed March 17, 1954—Rehearing denied May 19, 1954.*

CHARLES A. BELLOWS, of Chicago, for plaintiff in error.

LATHAM CASTLE, Attorney General, of Springfield, and JOHN GUTKNECHT, State's Attorney, of Chicago, (JOHN T. GALLAGHER, RUDOLPH L. JANEGA, ARTHUR F. MANNING, and JORDAN JAY HILLMAN, all of Chicago, of counsel,) for the People.

Mr. JUSTICE BRISTOW delivered the opinion of the court:

The March, 1933, grand jury of Cook County returned an indictment charging Ivan Grilec, plaintiff in error, John Milosic, Edward Veselka, Joe Fess and Vera Carl with the crime of murder of one George Carl. Vera Carl received a severance, and Edward Veselka and Joe Fess testified for the prosecution. Grilec's motions for a severance from Milosic were denied. Ivan Grilec and John Milosic were tried together and the jury found Ivan Grilec guilty of murder and fixed his punishment at life imprisonment, whereupon he was sentenced to the penitentiary for his natural life. Grilec alone has sued out a writ of error to review his conviction and sentence.

This 1932 murder stems from a crippled, unhappy and mercenary spouse, Vera Carl, who plotted the killing of her husband, George Carl, in order that she might collect $15,000 insurance from the Prudential Insurance Company. The plaintiff in error, Ivan Grilec, is a brother of Vera Carl and was 40 years of age at the time of the trial, June 26, 1933. His profit in the murderous enterprise was the payment of an indebtedness in the sum of $1000 which had been due him from the Carls for several years. He was a person that had previously borne a good reputation for being a peaceable and law-abiding citizen in his community and was a proprietor of a small grocery store in the neighborhood. Likewise, John Milosic, whose age was 50 years, was a person of substance, and he, too, had previously borne a good reputation, he having been previously employed for a span of 13 years by the Chicago Surface

Lines. Joe Fess, a dissipated and less substantial character, was the killer and the principal witness in these proceedings. Edward Veselka, another codefendant, testified at the trial that John Milosic solicited him to commit the murder, but that he advised Milosic that he was not in the least interested in the project.

Plaintiff in error in this proceeding to review his trial after the passing of a score of years has been ably represented, and he has pointed out many errors that intervened which he argues are of a reversible character. The most serious of the alleged errors can be readily and easily resolved if this court subscribes to the State's contention that Grilec was one of the active participants in the conspiracy that led to the death of George Carl on July 16, 1932. A very large portion of the testimony adduced on the trial related to conversations and actions of Vera Carl, John Milosic and Joe Fess, which testimony would not be admissible against plaintiff in error unless he was proved to be a co-conspirator. The jury by its finding was convinced that Grilec was one of the principals. Our problem, therefore, is to determine, after a careful analysis of the record, if the jury erred in this conclusion. A brief sketch of the testimony adduced at the trial is imperative so that plaintiff in error's relationship with the homicide may be accurately evaluated.

Joe Fess testified that he was approached by John Milosic in the early part of May, 1932, and offered the sum of $500 to kill someone. Fess did not know the name of the intended victim and at that time he refused, saying that it was not enough money; that he had another conversation with Milosic a few weeks later at which time Milosic told him that he would give him an additional $200 of his own money if he would put the man away; that the man's name was George Carl and that Milosic suggested various ways of killing him, such as taking him on a fishing trip and drowning him by tipping the boat, or

knocking him down the stairs and hitting him on the head with a tool.

Fess further testified that he first met Grilec in the month of June, about two weeks before the deceased was killed; that Grilec and Mrs. Carl were present at the deceased's store when there was a conversation about pushing the deceased down the stairs; and that Grilec said he did not want to have anything to do with it. Fess further testified that on July 3, 1932, Milosic gave him a 38-caliber revolver, and told him that he did not know whether it worked; that the next day Milosic tried to fire the gun and found it did not work and gave Fess $5 with which to have it repaired, whereupon Fess took the gun to a locksmith where the repairs were made; that Milosic told Fess to leave town so that people would not suspect him and to come back when the gun was fixed; and that Milosic gave him a few dollars, whereupon he went to Coleman, Illinois, and then to Waterloo, Iowa, returning shortly before July 16. Fess also testified: "While we were walking that day we met Mr. Grilec, John Pettek, and Mrs. Carl's boy. Ivan Grilec was walking ahead with John. Mrs. Carl asked me if I was going to go over to her house and kill her husband the next night and I said I would be over there. I don't know if Ivan Grilec heard the conversation." "Milosic told me to be at Carl's place at 9:00 o'clock. Grilec said he would be over at 9:00 o'clock Saturday night." "I met Milosic the next morning, we were sitting in the shoe store and Grilec walked by and he said he was going downtown. He walked with us down 25th Street to Lawndale and south on Lawndale to 26th Street. We then walked east on 26th Street where I alone went in and got the revolver. When I came out with the gun I did not have any conversation with Grilec or Milosic. Milosic tried to send me into a place to get some bullets but I told him he could go in himself. Milosic came out with a box of 38-caliber bullets and gave them to me. Grilec was present.

Grilec said that he would meet me between 8 and 9 o'clock at Carl's house. This conversation took place at 25th and Lawndale on the corner." "As I was sitting with Milosic he told me it was about time to go, that Ivan would be waiting for me at Carl's store." "Carl's store is a grocery in the front facing Crawford Avenue and there is a kitchen next to the store and in the back is a parlor." Fess further testified that when he arrived at Carl's store he found the shades drawn and George Carl sitting in the kitchen; that he and Carl sat around drinking, that he had whiskey and Carl was drinking beer; that Grilec came about an hour later and when Carl went out to get some beer, Grilec said: "Go ahead, now is the time to do it, now is your chance.;" that about 12 o'clock he was drunk and didn't know what he was doing, that he took his revolver out and went to the toilet and when he came back he shot Carl in the temple, that the deceased called to Grilec to get him a towel and Grilec got a towel and wiped the blood off of his forehead; that when Carl got up he shot him again, that after the shooting Grilec told him to leave the store and everything would be alright; that he immediately left for Coleman, Illinois, and Veselka met him there and gave him money; that when he came back to Chicago, Milosic told him the police had picked him up and held him for one day for the murder of George Carl; that Milosic gave him the sum of $640 altogether and told him that he received it from Mrs. Carl and that Mrs. Carl was going to get her insurance. Whereupon, Fess departed for California.

Angela Perme, appearing as a witness for the People, testified that she lives at 3245 S. Crawford Avenue, that she knew John Milosic, Ivan Grilec, Joe Fess, Ed Veselka, and Vera Carl; that she operated a saloon or soft drink parlor in the spring and early summer of 1932; that she saw Milosic and Fess talking together around her place of business many times during the month of June, 1932.

That on one or two occasions she saw Grilec and Milosic talking together on the outside of her premises.

John Milosic, the day following his arrest, February 25, 1933, confessed to the State's Attorney that he had hired Joe Fess to kill George Carl and paid him $800. This led to the arrest of Joe Fess, Vera Carl and Ivan Grilec and Edward Veselka. On the same day Ivan Grilec made a statement. It is not contended by Grilec that his statement was not completely voluntary or that it was the product of abuse or promises of leniency. Significantly, his statement concerning the events and circumstances that immediately preceded the killing and those that followed were almost the same as the account given by Fess from the witness stand. Grilec explained this incriminating aspect by saying that he was able to supply the details because he had heard Fess questioned and had heard the reading of his signed statement. On the trial Grilec denied that he was present in the Carl home on July 16. He explained that his statement was to the contrary because he desired to safeguard his sister, pursuant to a suggestion by officer Shoemaker on the occasion of his arrest, who said: "Why don't you admit that you were there and that is not going to make you guilty. By so doing you can get your sister out." The record indicates that Grilec had been drinking rather excessively all day on July 16 and that at the time of the killing he was pretty drunk. Grilec admitted that some time in September he received $1000 from his sister, Vera Carl, which was in satisfaction of a debt of long standing.

A stenographic transcript of the interview between Grilec and officer Shoemaker was used at the trial as a foundation for impeaching questions. To illustrate: "Q. You say that you were not at George Carl's place on the night that George Carl was killed? A. I was not. Q. During the time he was being killed? A. No sir." "Q. Now

in Officer Shoemaker's office on February 26th were not the following questions asked and the following answers given? 'Q. And when you came in there, where did you go? A. I went through the side and then I went to Crawford Avenue. I wouldn't enter the place at that time through the back. I went through the front to the sideway and not through the store. When I got in there, George came to the door. I knocked and George himself knew I didn't know this man. Q. When you came in the first place, George Carl introduced you to Joe? A. To Joe as Joe. He didn't use no last name, for until this day until you told it to me I didn't know his last name. Q. Well then what happened? A. Well Joe was seated at the corner at one table, and after George had escorted me to the kitchen and told me to take a chair he sat right along side of Joe as they were previous to my calling. Q. And weren't there some drinks served? A. Well George and Joe participated in drinks. There was some substance there at the time I called. Q. What was there? A. There was a bottle of Atlas beer, and I think George was consuming that and this fellow was drinking the hard stuff. Q. Joe was drinking whiskey? A. Yes. * * * Q. What were they talking about? A. Oh, I guess past fishing trips and different things, and I am just taking note of the paper and don't take particular note when Joe got off the chair and went to the bathroom, and when he came back he evidently drew a pistol from somewhere. Q. Was he standing in back of George when he shot him? A. He did at the time. Q. Then what happened? A. I got up immediately when I heard the shot. I was never suspecting it, and I was ordered right away to put the light out, which I did, because when he was saying it to me he was pointing the gun at me, which I was nervous myself, but I put the light out. Joe was on his way through the back, and I was all nervous; I didn't know what to do. George was reeling off his chair, and falls underneath the table, and he calls out to

me, "Ivan, Ivan." Q. What part of the head did he shoot him in? A. In the left part of head. Q. The left temple? A. Yes.' " Such questioning at the trial covered about 12 pages of the abstract. Grilec stated in detail everything that was said and done in Carl's home on the fateful night. His account in his statement of what transpired was identical to the one given by Fess. If Grilec answered truthfully all the questions propounded him by officer Shoemaker it would appear that he was fully aware of the development of the scheme to destroy his brother-in-law. It was within the jury's province to search for the truth concerning Grilec's involvement in the planned slaying of George Carl. Although the plaintiff in error was more or less in the background and his activity in promoting the enterprise was less prominent than Milosic and his sister, nevertheless, it is more than inferable that he did lend his aid and presence and encouragement in the perpetration of the murder. The language employed by this court in the case of *People* v. *Smith,* 391 Ill. 172, at page 180, is appropriate: "It is true that mere presence is not sufficient to constitute one a principal unless there is something in his conduct showing a design to encourage, incite, or in some manner aid, abet, or assist the assault. Of course, an innocent spectator is not criminally responsible because he happens to see another commit a crime, but if the proof shows that a person is present at the commission of a crime without disapproving or opposing it, it is competent for the jury to consider this conduct in connection with other circumstances and thereby reach the conclusion that he assented to the commission of the crime, lent to it his countenance and approval and was thereby aiding and abetting the same."

Grilec's testimony concerning what occurred on the day and night of July 16 was diametrically opposite to the damaging admissions that he made to the police officers on the occasion of his arrest. The reason that he assigned

for the change in his position was indeed a lame one. It is our considered view that the jury found ample support in the proof for their determination that the plaintiff in error was one of the active conspirators.

This answers one of the substantial contentions made by the plaintiff in error in his brief, namely, that much of the testimony adduced on his trial was of a hearsay character and therefore inadmissible. At the beginning of the trial plaintiff in error specifically objected to certain conversations testified to by Fess that took place between Fess and members of the conspiracy, other than Grilec, outside of Grilec's presence. The trial court painstakingly pointed out to the jury that unless Grilec's participation in a conspiracy was ultimately shown by competent evidence, Fess's testimony of his conversations with Milosic were competent against the codefendant Milosic, alone. This procedure was proper because it was impossible to demonstrate Grilec's connection with the conspiracy by a single witness or even a group of relevant facts and circumstances. It frequently requires the whole of the evidence to prove a conspiracy and the relationship of its projectors. As it was said in *Spies* v. *People,* 122 Ill. 1, at page 238: "The rule, that the conspiracy must be first established *prima facie,* before the acts and declarations of one conspirator can be received in evidence against another, cannot well be enforced 'where the proof of the conspiracy depends upon a vast amount of circumstantial evidence, a vast number of isolated and independent facts; and, in any case, where such acts and declarations are introduced in evidence, and the whole of the evidence introduced on the trial, taken together, shows that such a conspiracy actually exists, it will be considered immaterial whether the conspiracy was established before or after the introduction of such acts and declarations.' "

Another argument advanced by plaintiff in error on this review was that the court committed reversible error in the refusal of his motions for a severance. The general

rule is that where one or more defendants are jointly in-. dicted for the commission of a crime, they are to be tried together; and whether a separate trial should be granted is largely within the sound judicial discretion of the trial court. (*People* v. *Barbaro,* 395 Ill. 264; *People* v. *Mutter,* 378 Ill. 216.) The record here discloses not only that the defenses of Grilec and his codefendant Milosic were not antagonistic, but, on the contrary, they were wholly consistent and harmonious. The paramount inquiry or test is, are the defenses of such an antagonistic nature that a severance is imperative to insure a fair trial. We are of the opinion the trial court did not err in denying plaintiff in error's motion for a severance.

We have given careful consideration to other assignments of error and have concluded that plaintiff in error received a fair trial free of reversible error. The record substantiates the jury's finding of guilty. The judgment entered herein should be and is affirmed.

*Judgment affirmed.*