(No. 40535.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, *vs.*
CHARLES ROSS and JOSEPHINE PAWLAK, Appellants.

*Opinion filed Nov. 22, 1968.—Rehearing denied Jan. 28, 1969.*

446

Ward, J., took no part.
Schaefer, J., dissenting.

Julius Lucius Echeles and Warren Wolfson, both of Chicago, for appellant Charles Ross.

Jo-Anne F. Wolfson and Bernard B. Brody, both of Chicago, for appellant Josephine Pawlak.

William G. Clark, Attorney General, of Springfield, and John J. Stamos, State's Attorney, of Chicago, (Fred G. Leach, Assistant Attorney General, Elmer C. Kissane and Joel M. Flaum, Assistant State's Attorneys, of counsel,) for the People.

Mr. Justice Kluczynski delivered the opinion of the court:

Defendants Charles Ross and Josephine Pawlak were jointly tried and convicted of arson in a jury trial in the circuit court of Cook County. They appeal directly to this

court, charging that they were denied due process in that the indictment was insufficient and failed to inform them of the nature and cause of the accusation against them. Additionally, they contend that the evidence was insufficient to establish guilt beyond a reasonable doubt, that they were denied an opportunity to impeach the State's chief witness on the basis of statements he made to the police and that "secret ex parte proceedings were held between the prosecutor and the court," thereby denying them the constitutional right to be present at all stages of the proceedings.

Mrs. Pawlak further claims that her motion for discharge should have been allowed because she was not tried within "four terms of court" and that the attempted impeachment of her on rebuttal was improper. Ross asserts error was also committed when his motion for severance in the second trial was denied.

The indictment charged these defendants, together with Bernard Mayes and George Mauricaux, with having, on May 3, 1964, committed the offense of arson "in that they, by means of fire knowingly damaged the building of General Federal Savings & Loan Association, a corporation, without the consent of said General Federal Savings & Loan Association in violation of Chap. 38, section 20—1, Ill. Rev. Stat., 1963." That section provides, in relevant part, "A person commits arson when: (a) By means of fire * * * he knowingly: (1) Damages any building of another without his consent." The section further provides that: "A building or property 'of another' means a building or property in which a person other than the offender has an interest which the offender has no authority to defeat or impair, even though the offender may also have an interest in the building or property." Ill. Rev. Stat. 1963, chap. 38, par. 20—1.

While conceding that the indictment charges the offense in the language of the statute, defendants contend that both the statute and the indictment are so vague and indefinite

that they fail to apprise the defendants of the nature and cause of the accusation. Specifically, they charge that the definition in the statute of "a building or property of another" is so ambiguous and so susceptible of a variety of meanings as to lack the constitutional precision and exactness required in a criminal statute. "The constitutional requirement of definiteness is violated by a criminal statute that fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute. The underlying principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." (*United States* v. *Harriss*, 347 U.S. 612, 617, 98 L. Ed. 989, 996, 74 S. Ct. 808; see also *People* v. *Reed*, 33 Ill.2d 535, 538.) We cannot agree with the defendants that the statute is so difficult of comprehension. Certainly, any person of ordinary intelligence has fair notice what conduct the statute proscribes. The statement that one knowingly causing damage by fire to a building whereby the interest therein of any other person, without his consent, is defeated or impaired constitutes a crime, is not ambiguous, vague or indefinite. The same may be said of the words constituting the statutory definition of "a building or property of another."

We further find no basis for defendants' contention that the indictment failed to inform them of the nature and cause of the accusation against them. Every indictment must be sufficiently specific to inform the offender of the nature and character of the accusation against him and to serve as a bar to a subsequent prosecution for the same offense. (*People* v. *Patrick*, 38 Ill.2d 255; *People* v. *Griffin*, 36 Ill.2d 430; *People* v. *Johnson*, 34 Ill.2d 202; *People* v. *Reed*, 33 Ill.2d 535.) The indictment in this case charged the offense in terms of the statute which is deemed sufficient to meet constitutional requirements "when the words of the statute so far particularize the offense that by their use alone an accused is apprised with reasonable certainty of

the precise offense with which he or she is charged." (*People v. Patrick,* 38 Ill.2d at 258.) The indictment here, being framed in the statutory language and identifying the property damaged by fire as that of the savings and loan association, was sufficient to advise the defendants with reasonable certainty of the precise offense charged and to enable them to prepare their defenses. Furthermore, they requested and were granted a bill of particulars specifically setting forth the date and time the offense was committed and the persons known to be present when it was committed. Further particularization was not necessary to bar any subsequent prosecution for the same charge.

Defendants next contend that "even if the statute be held constitutional and the indictment under it proper", there was no proof as charged in the indictment in that there was considerable variance between the State's proof and the allegation that the property was the "building of the General Federal Savings and Loan Association" on May 3, 1964. For the determination of this and the other contentions on appeal, we turn to the evidence adduced in the trial of this cause.

In January 1960, defendant Pawlak and her husband (since deceased) borrowed $75,000 from the General Federal Savings and Loan Association and to secure payment thereof executed a mortgage on the one-story restaurant and cocktail lounge, known as the Cottage Restaurant, located on the northeast corner of Mannheim and Butterfield roads in Bellwood, Cook County, Illinois. The premises were insured in the amount of $120,000. The business proved a failure and closed on January 5, 1964. At that time there was due and owing the sum of $76,922.86, representing principal and interest on the loan. There was also an outstanding chattel mortgage on the business fixtures with a balance of $11,000 or $12,000 due. The original cost of the liquor license amounting to $7000 was unpaid and, in addition, defendant Pawlak owed to the United States

government the sum of $1200 in deducted payroll payments. The association instituted foreclosure proceedings in February 1964 and on March 11, 1964, the circuit court of Cook County entered an order by which the association was "placed in possession of the real estate described in the complaint filed in this cause with such powers as are granted by statute to a mortgagee in possession."

On May 3, 1964, at 11:00 P.M., firemen of Bellwood responded to a fire at the premises. On inspection, after the blaze was extinguished, two "Martin" fuel oil cans were discovered in the boiler room and in the kitchen, respectively. Later, three five-gallon milk cans were found outside the rear door on the north side of the building. One of these cans was filled with flammable liquid and the other two were empty except for a thin film of sour milk. The premises contained a gas furnace but the gas had previously been turned off and the meter padlocked. Evidence of a flammable fluid was found in partially consumed carpeting in the west end dining room area and a piece of the rug, removed and tested by a chemist, disclosed that it contained a flammable substance similar to naphtha. There was testimony that the walls bulged out, causing a collapse of the east, west and south walls, and the grilles of a return air duct, normally imbedded in the floor, were blown up and out. An expert concluded that vapors from a flammable liquid had exploded within the building and in his opinion the fire was definitely of incendiary nature.

Although the cause of the fire was an immediate subject of investigation, it was not until December, 1964, that George E. Mauricaux was taken into custody and confessed culpability in the arson, implicating Bernard Mayes and these defendants. All four were indicted but these defendants were granted a severance and tried jointly.

Mauricaux, who was the State's chief witness, testified that he had known defendant Mrs. Pawlak for about 17 years and worked for her intermittently and at various

times was employed at the restaurant. He stated that when the business closed in January, 1964, Mrs. Pawlak obtained employment at a restaurant in Chicago and he drove her to and from work practically every day. In late February or early March, when he asked her what was going to happen to the restrauant, she said, "The best thing that could happen to the Cottage Restaurant is to burn it down to the ground." She told him that if he would do her this favor, she would never forget him or could never do anything to hurt him, that there would be $12,000 for the person who did it and that he (Mauricaux) would get a new Cadillac. A day or so later, he told her he had talked to somebody who wanted no part in it but who suggested that he find someone else. He saw her again on Easter Sunday, March 29, when she said, "This will be a good time for the Cottage to burn up, we have a snow blizzard." He told her he hadn't "got a hold of anybody." Mauricaux knew defendant Ross who had worked at Martin's gas station adjacent to the Cottage Restaurant for four or five years. Several days after Easter, Mauricaux visited Ross at his garage on Roscoe Avenue in Chicago and told him that Mrs. Pawlak and he would like the restaurant burned and that there was $1000 in it for the person who did it. Ross told him it "sounded good". After informing Mrs. Pawlak of Ross's response, he again visited Ross and left with him a card on which he wrote Mrs. Pawlak's telephone number and told him to call and verify the offer. This card was found by an agent of the Illinois Crime Commission at Ross's garage in December 1964. In mid-April, Mrs. Pawlak expressed concern regarding the delay. Mauricaux had several conversations with Ross, and toward the end of April, Ross introduced him to Mayes. Ross told Mayes that Mauricaux was "his man" and Mauricaux told him "they" wanted the restaurant burned. There was some mention of money. Ross said Mauricaux could come up with $300 and he (Ross) would stand good for the $700. Mayes said it

"sounded good". Mauricaux then obtained a loan with Mrs. Pawlak's approval and he gave Mayes the sum of $280. Ross said the job would be done and that "they were over and there was a vent in the back door of the Cottage Restaurant and there was six or eight sheet metal screws to be taken out and that was it." Mauricaux then said he went over and "somebody had taken them out and there was one or two left in there." Mauricaux took three milk cans, rinsed them out, took them to a hardware store in Bellwood, had them filled with naphtha, and placed them in the breezeway at the restaurant. As he walked by the premises the next day, he noticed the cans were leaking. On the day before the fire he spoke with Ross at the garage concerning the leaking cans. Ross gave him two 5-gallon cans and $2 and told him to have them filled up. He had them filled with gasoline at Martin's and dropped them off at the breezeway. He saw Mrs. Pawlak on Sunday, May 3, and told her that the restaurant was "going up" that day, "and she said she didn't want to know nothing, to have no tongue, and she could never forget me or do anything to hurt me and I told her likewise." The day after the fire Mauricaux saw Ross and Mayes at the garage. They remarked that "we must be professional arsonists, we had to get third degree burns." Mayes told him he threw a match, it went out but that he threw a second one and it went off. He was lucky, Mayes said, that he didn't get killed. A day or so later Mauricaux told Ross he had a subpoena to testify before the State fire marshal. Ross told him not to worry, that there was nothing that could be proved. Although Mauricaux testified under oath at the fire marshal's hearing, he said he did not tell the truth. He saw Ross that night and told him that while at the fire marshal's hearing he overheard that they had his fingerprints on a can and Ross told him that they were bluffing, that fingerprints couldn't last in the open air over night. Ross then asked for the money

and he told him that when he got paid, Ross would get paid. About three weeks later (in June) he, accompanied by his girl friend, Cathy Kunkel, saw Ross and Mayes at Ross's home. Ross asked "How did Ma (Mrs. Pawlak) like our job" and also asked for the money. Again, Mauricaux said that as soon as he got the money they would get "theirs". Next day he asked Mrs. Pawlak for the money and she answered that when she got it, they would get paid.

Portions of Mauricaux's testimony were corroborated by the testimony of his girl friend and that of the hardware store owner. The girl friend, Cathy Kunkel, who in August, 1964, had entered a religious order and was a novice in a convent when she testified, recalled being with Mauricaux on a Sunday afternoon about three weeks after the fire when they drove up to Ross's house. Ross and Mayes got into the back seat of the car and she heard Ross ask Mauricaux for the money for the job. When Mauricaux said he didn't have it, Ross replied: "We want the money, we are waiting for it." She heard Ross say that they had set off such a good fire that the police thought it was a professional job. Mayes agreed. One of them, she said, mentioned the fact that the fire went up so quickly that he had to leave his glove there. The fire chief had testified to finding a pair of canvas gloves in the boiler room. She accompanied Mauricaux when he picked up Mrs. Pawlak at the restaurant on several occasions. While in the car, on one of those occasions about three weeks after the fire, she heard Mauricaux ask Mrs. Pawlak if she had the money and Mrs. Pawlak replied that she could not get it. Two weeks later, Mauricaux again asked for the money because he said the boys were asking for it. Mrs. Pawlak said the insurance had not gone through and so she didn't have it. She overheard a similar conversation between Mauricaux and Mrs. Pawlak some time in June. The hardware store owner testified that he knew Mauricaux some 17 years, that

he did not deal in naphtha but that some time in the spring of 1964 he had sold him (Mauricaux) 15 gallons of benzene in three 5-gallon milk cans.

Direct and cross-examination developed that Mauricaux, 32 years of age, had elementary education up to the seventh grade and could read and write a "little". He had intermittent employment and after the death of his mother lived with a mentally disturbed sister. When testifying under oath before the fire marshal he did not tell the whole truth. He said that when he appeared before the grand jury in October, 1964, he did not tell the truth "about the fire". He did, he said, tell the truth when he again appeared before the grand jury in January 1965. In 1961, after being jailed on a minor offense, it was suspected that he attempted suicide and as a result spent about 44 days in some mental institutions. In 1963, he served in the Army for about six months and was discharged because he "could not adjust to military service." In the Fall of 1964 Mauricaux contended he was a partner in the restaurant business Mrs. Pawlak established with $2300 she obtained from his mother. The dispute precipitated his arrest when he entered the restaurant in possession of a pistol. In January, 1965, he caused her arrest on a warrant charging her with theft of the $2300. Both matters were dismissed for want of prosecution. After confessing his culpability in December, 1964, he remained in the witnesses' quarters at the county jail until December 1965. The State paid $310 for his dental care and he received a loan of $50 from the Illinois Crime Commission for the installation of a phone in his home after the death of his mother. He had not repaid this loan.

Ross, testifying in his own defense, denied any part in setting the fire. He claimed that the card with Mrs. Pawlak's number found in his garage, was there at Mauricaux's request because he could be reached there whenever Ross had a cheap used car for sale. He also contended that from

May 1, 1964, through May 4, 1964, he was visiting his folks in Jasper, Marion County, Tennessee, and that on May 3 he was lodged in jail there for being drunk and was not released until the following morning after telling Officer Layne he would plead guilty, and his father-in-law, Andrew Jackson, had agreed to pay the fine of $23.75.

Seth Layne testified that in May, 1964, he was a deputy sheriff in Marion County, that he arrested and lodged Ross in jail on May 3, 1964, for being drunk and recorded the arrest in the "Register of Prisoners Committed to County Jail" on that date. A register was introduced in evidence showing an entry at the bottom of page 29 thereof that Charles E. Ross was charged with public drunkenness by Layne on May 3, 1964, and was released on May 4, 1964, by "Cash Bond paid by father". Layne said Ross's father had called and assured him on May 4 that he would stand good for his son's fine. He then released Ross, although he admitted that a formal release issues after the fine is paid to the circuit court clerk. The fine was paid by Ross's father to Layne on December 14, 1964, and a receipt obtained from the court clerk. This was after the time Cook County officials had made contact with the sheriff's office of Marion County regarding Ross. Layne said that he did not recognize a photograph of Ross when shown to him by Illinois officials but that he did recognize him as the man he had arrested when confronted with Ross in person, in company with Ross's counsel. Both Ross's father and father-in-law testified substantiating his account of his presence in Marion County in May of 1964.

David Braden, deputy sheriff of Marion County, testified that he was the jailer of the county jail in May, 1964, that he knew Ross's father well and Ross slightly, and that he did not see Ross in the Marion County jail on May 3, 1964, but couldn't say positively that he was not there. Ruben Hudson, also deputy sheriff of Marion County, and keeper of the records for the sheriff's department, testified

that at the end of each month it was his duty to transfer the names of prisoners appearing in the register into another book similar to a receipt book. The original sheets of this monthly compilation were sent to the county judge to determine what prisoners were confined in the county jail for whose board the county was liable. The carbon copy of this compilation remained in book form and was kept in the county jail. It was accessible to anyone "who wants it". The first page of the May, 1964, entries in the jail carbon copy was torn out and missing. The original copy kept in the judge's office was available and did not contain any record of Ross's arrest and confinement although others listed before and after Ross's name in the jail book were contained thereon.

Mrs. Pawlak took the stand and denied any implication in the offense charged, denied any conversations with Mauricaux regarding the fire and further denied knowing either Ross or Mayes. She introduced witnesses who testified to her good character, and the bad reputation of Mauricaux for telling the truth. In rebuttal, Lt. King of the Chicago Police Department on loan to the Illinois Crime Commission, testified that, subsequent to her arrest, Mrs. Pawlak admitted talking with Ross and Mayes but claimed that fact didn't indicate she had anything to do with the arson.

We have intentionally particularized the evidence in this case due to the defendants' insistence that there was a fatal variance between the proof and the indictment and that the evidence was insufficient to establish their guilt beyond a reasonable doubt.

We find no variance between the accusation as described in the indictment, *i.e.,* that defendants, by means of fire, knowingly damaged the building of the association, and the proof adduced at the trial. "Building of another" as defined by the statute, encompassed the type of lien interest and possessory right of the association in the case. De-

fendants' contention that "no fire could defeat or impair" the mortgage interest of the association because it was fully insured is untenable. "Defeat or impair" as used in the definition contained in the statute described the nature of the interest and not the ultimate financial result of the proscribed act.

In support of their charge that the evidence "is so inclusive and unsubstantial, so bizarre in the making as to call for a reversal", defendants argue that their convictions depend upon the "uncritical acceptance of a psychotic liar and admitted perjurer whose bias, prejudice, vindictiveness and motivation for lying was amply demonstrated." It is undeniable that the State's case depended to a large extent upon whether the jury would believe the testimony of Mauricaux, the admitted go-between and accomplice in the arson. However, it must be noted that even the uncorroborated testimony of an accomplice, if it satisfies the court or jury beyond a reasonable doubt, is sufficient to sustain a conviction of a felony. Such testimony is not of the most satisfactory character and often is attended by serious infirmities (such as malice towards the accused, promises or hopes of leniency, or the hope of benefits from the prosecution). Yet, "Such infirmities, in turn, go to the questions of the weight of the evidence and the credibility of the witnesses, matters *peculiarly* within the province of the court or jury in the first instance, and if the jury or trial court is satisfied by the testimony of an accomplice that the defendant is guilty beyond a reasonable doubt, we will not disturb a conviction on review unless it is plainly apparent that such degree of proof is lacking." (Emphasis ours.) *People* v. *Hansen*, 28 Ill.2d 322, 332, 333.

Mauricaux's testimony was consistent on all material issues and in addition was corroborated by other witnesses and physical facts. The gas cans Mauricaux said were given to him by Ross were found outside the premises. The card with Mrs. Pawlak's phone number which he said he gave

Ross was found in Ross's garage. Mauricaux's girl friend corroborated his testimony regarding statements made by Ross and Mayes of their participation in the crime, their pride in their "professional job" and their demands for payment by Mrs. Pawlak. She further corroborated his testimony regarding Mrs. Pawlak's responses to the demands for payment. The jury had before it more than the naked testimony of an accomplice. They were in a position to see and hear the witnesses and to observe their demeanor while testifying. They were able to not only evaluate Mauricaux's testimony but that of Ross and Mrs. Pawlak as well. It is for them to accept the testimony they believe, reject what they do not believe and return a verdict accordingly. In our judgment the evidence is not so improbable as to raise a reasonable doubt of the defendants' guilt and cause us to reverse the convictions. See *People* v. *Woodruff,* 9 Ill.2d 429; *People* v. *Flowers,* 14 Ill.2d 406.

Defendants maintain that they were denied an opportunity to impeach Mauricaux on the basis of statements he made to police on December 2, 1964. When testifying, Mauricaux stated that the interrogating officers wrote down what he said when he was questioned that day in the offices of the Illinois Crime Commission. There is no question but that such statements are subject to discovery, the general rule being that "the prosecution is required to furnish on demand to the defendant for impeachment purposes specific statements in its possession made by a State's witness which have been established to exist and which are the witness' own words or substantially verbatim." *People* v. *Neiman,* 30 Ill.2d 393, 397.

A determination of whether defendants were denied their rights requires an examination of the facts surrounding the demand for the writings. After Mauricaux made the statement that the officers of the Illinois Crime Commission wrote down what he was saying on December 2, 1964, defense counsel demanded the production of the statement.

The State informed the court that no formal statement was made that day, and defense counsel then demanded the production of notes or reports the interrogators may have had. The court recessed the trial while the assistant State's Attorney made an unfruitful search of his file. The State then informed the court that it had previously given the defense the only statement or material it had in its possession, a statement made on December 3, 1964, which fact defendants did not deny.

We find no denial of access to the witness's statement for impeachment purposes. The court did not deny the defense access to any available records. Although Mauricaux's testimony was that a writing was made on December 2, there was no showing that any writing was in existence nor did the defense seek to probe beyond the contents of the prosecutor's file at the time to determine if any notes or statements were made.

We also find no merit to defendants' charge that secret *ex parte* proceedings were conducted between the prosecutor and the court denying them their constitutional right to be present at all stages of the proceedings. The basis of this claim was the trial court's issuance, on the State's motion, of a certificate pursuant to the "Uniform Act to Secure the Attendance of Witnesses From Within or Without a State In Criminal Proceedings" (Ill. Rev. Stat. 1965, chap. 38, par 156—1) declaring Seth Layne, the deputy sheriff from Tennessee, to be a material witness who would rebut defendant Ross's alibi. The record reflects that this action, far from being secret, was agreed to by the parties and, in fact, relied upon by the defense as a means of securing the testimony of Layne which proved favorable to the defendants at trial.

Mrs. Pawlak claims that she was not "tried within four terms of court" as provided by section 103—5 of the Code of Criminal Procedure (Ill. Rev. Stat. 1965, chap. 38, par. 103—5), and that her motion to dismiss the charge pursuant

to section 114—1 of the Code (Ill. Rev. Stat. 1965, chap. 38, par. 114—1) should have been allowed.

The first trial was disrupted by virtue of a mistrial on September 29, 1965, and continued to November 15, on which later day she demanded trial. The cause was then continued several times thereafter on the State's motion until February 28, 1966, over defendant's objection and demands for trial. After the case was called for trial on the latter date, the State made application by affidavit alleging that one David Blake Braden was a material and essential witness, that the State's Attorney had exercised due diligence to produce this witness before the court on March 1, 1966, that he was then hospitalized in Pittsburg, Tennessee, and would remain so for some time but that there was reasonable ground to believe that this witness could be produced at a later date, and requesting that the court "extend the time under which the Fourth Term Act for a period of sixty (60 days) as to the above captioned defendant" pursuant to section 103—5(c) of the Code of Criminal Procedure. (Ill. Rev. Stat. 1965, chap. 38, par. 103—5(c).) The court sustained the motion and continued the cause to April 26, 1966, on which day Mrs. Pawlak's motion to dismiss the charge was denied and the cause proceeded to trial.

She now argues that the extension of time was not valid as to her because the witness Braden was a prospective rebuttal witness only against co-defendant Ross, citing his lack of testimony against her at the first trial. The State contended she was criminally accountable for the arson only if her agents set the fire, as evidenced by its instruction to the jury that if they "found beyond a reasonable doubt that the burning of the Cottage Restaurant was the act of one defendant and another defendant aided, abetted or encouraged either directly or indirectly the first defendant then both are guilty of the crime of arson" pursuant to section 5—2 of the Criminal Code. (Ill. Rev. Stat. 1965,

chap. 38, par. 5—2.) Therefore, any attack on Ross's alibi materially effected the case against Mrs. Pawlak. The granting of the motion for extension of time is within the discretion of the trial judge (*People* v. *Wollenberg,* 37 Ill.2d 480, 487) and under the circumstances present we find no abuse of such discretion.

We next consider defendant Ross's charge that the court erred in denying his motion for severance made in advance of the second trial. The affidavit filed in support of Ross's petition for severance charged, *inter alia,* that a prosecution witness, Lt. King, testified as to the content of a conversation with co-defendant Mrs. Pawlak on December 3, 1964, outside his presence. In the conversation Lt. King suggested that Mauricaux had discussed with her Ross's participation in the crime, and she replied, "Yes, but you don't believe him, do you?" Ross's objection to the testimony was sustained. The affidavit also stated that defense counsel was informed and believed the above testimony would be reintroduced at the retrial and would prejudice Ross in the eyes of the jury.

With regard to a severance, "the general rule is that where one or more defendants are jointly indicted for the commission of a crime, they are to be tried together; and whether a separate trial should be granted is largely within the sound judicial discretion of the trial court. (*People* v. *Barbaro,* 395 Ill. 264; *People* v. *Mutter,* 378 Ill. 216.)" (*People* v. *Grilec,* 2 Ill.2d 538, at 546, 547.) Ross contends that the failure to sever the prosecutions was an abuse of such discretion because his affidavit demonstrated how he would be prejudiced in a joint trial, namely, by Lt. King's hearsay testimony linking him with Mrs. Pawlak. The use of this testimony at trial is also assigned as error although the court by instruction limited its application to Mrs. Pawlak. In past cases, where the defenses were not antagonistic and cautionary instructions were given, as herein, a

denial of severance was not found to be an abuse of discretion even though exculpatory statements of co-defendants were conflicting (*People* v. *Brinn,* 32 Ill.2d 232) or were hearsay as to the moving party. (*United States* v. *Torres,* 354 F.2d 633.) It is urged, however, that the recent decision of the United States Supreme Court in *Bruton* v. *United States,* 391 U.S. 123, 20 L. Ed. 2d 476, 88 S.Ct. 1620, is controlling in the present case and compels a contrary finding.

In *Bruton,* the Court held that in a joint trial the admission of a co-defendant's extrajudicial confession inculpating the defendant was reversible error notwithstanding that the jury was instructed to disregard it in determining the latter's guilt or innocence. In that case, the confessing defendant did not testify, thus denying the nonconfessing defendant his constitutional right to confront and cross-examine the witnesses against him. (See *Pointer* v. *Texas,* 380 U.S. 400, 13 L. Ed. 2d 923, 85 S.Ct. 1065.) Moreover, the prejudicial effect of the inculpating confession was intensified since the other evidence of defendant's guilt was slight. As such, *Bruton* is clearly distinguishable from the instant case. The hearsay statement complained of did not directly implicate Ross in the crime charged; it was merely evidence that he knew Mrs. Pawlak, a fact otherwise established by the testimony of Mauricaux and Cathy Kunkel and by Ross's possession of Mrs. Pawlak's card. Furthermore, Mrs. Pawlak took the stand and denied knowing Ross or making such a statement. Under these circumstances, the prejudice to Ross was not so great as to render the denial of a severance an abuse of discretion or to otherwise require the granting of a new trial.

Finally, defendant Mrs. Pawlak, claims that the impeachment of her testimony on rebuttal by Lt. King was improper. In particular, she complains of certain of his remarks to the effect that "they checked out" Mauricaux's story and found it to be the truth. Unless incompetent

testimony is objected to at the time of its admission, any objection to it is waived. (*People* v. *Trefonas,* 9 Ill.2d 92, 98; *People* v. *Pittman,* 28 Ill.2d 100.) It is clear from the record that Mrs. Pawlak's counsel made no objection to King's "checked out" testimony. Therefore, it cannot constitute a basis for reversal.

We have carefully considered the foregoing contentions, as well as all other arguments advanced by defendants. We find no reversible error was committed and therefore the judgment of the circuit court of Cook County is affirmed.

*Judgment affirmed.*

Mr. JUSTICE WARD took no part in the consideration or decision of this case.

Mr. JUSTICE SCHAEFER, dissenting:

This case was tried twice. The first trial resulted in a hung jury, which is the "mistrial" referred to in the majority opinion. Prior to the second trial, the defendant Ross moved for a severance on the ground that at the first trial Lt. King had testified to statements, allegedly made to him by the defendant Pawlak, which implicated Ross in the crime. The motion for severance was denied.

At the second trial the prosecution again called Lt. King, on rebuttal, and the following occurred:

Q. "Tell the court and jury what was said by you, what was said by Mrs. Pawlak.

"KING: I said to her, 'I am surprised, disappointed in you.' And she said, 'You don't believe everything that Mauricaux told you, do you?' I said, 'I do. Because—"

"Mr. WOLFSON: On behalf of Ross object to this entire testimony.

"The COURT: "It doesn't pertain to Ross at this point.

"KING: I said, 'I do, because everything he told us we have checked out and it has been the truth.' I added, 'You know about Mayes and Ross, you talked with them about being hired to do this job.' And she said, 'Yes, I talked with them but that in no way indicates I had anything to do with it.' I said, 'It does to me indicate you had knowledge of it.' Also I said, 'You didn't report this to any police agency from that day to this.' That was the termination."

No one contends that this hearsay testimony was admissible against Ross, and in my opinion the *Bruton* case requires that the judgment be reversed as to him. The majority attempts to distinguish *Bruton* on grounds which, in my opinion, are inadequate. Despite the majority's assertion to the contrary, Lt. King's hearsay statement directly implicated Ross in the crime charged. There were no "cautionary instructions" in this case. The only statement made by the trial judge with respect to this testimony was his ambiguous observation, when overruling Ross' objection to the alleged conversation, "It doesn't pertain to Ross at this point."

The majority states that Mrs. Pawlak took the stand and denied making this statement. I am unable to see how that fact affords a basis for distinguishing this case from *Bruton*. What was said by the United States Court of Appeals for the Sixth Circuit in *Townsend* v. *Henderson* (No. 18516, decided December 26, 1968, 4 Cr. L. 2338), would then be pertinent. "The only possible distinction between the present case and *Bruton* is that in *Bruton* the co-defendant did not take the witness stand, whereas here Terry did testify in his own behalf. But, this distinction is unimportant since, although Terry was called as a witness, he denied making the confession. Townsend therefore had no effective right of cross-examination in regard to the confession. A similar question was presented in *Douglas* v. *Alabama,* 380

U.S. 415, 420 (1965), and it was there held 'effective confrontation of Loyd was possible only if Loyd affirmed the statement as his.' "