The People of the State of Illinois, Plaintiff-Appellee, *v.* Larry Henderson, Defendant-Appellant.

(No. 72-176; )

Third District—March 29, 1974.

STOUDER, J., dissenting.

Stephen Hurley, Assistant Appellate Defender, of Ottawa, for appellant.

Jose Nunes, Assistant State's Attorney, of Joliet, for the People.

Mr. JUSTICE ALLOY delivered the opinion of the court:

Defendant Larry Henderson appeals from a conviction of burglary in the Circuit Court of Will County. A jury had found him not guilty of the charge of murder but did find him guilty of burglary. He was sentenced to a minimum of 3 years and a maximum of 6 years, but as a result of a summary motion for sentence reduction, without prejudice to the appeal, his sentence was reduced to a minimum of 2 years with a maximum of 6 years. On Henderson's appeal from the conviction of burglary, he contends (1) that the jury verdict of guilty of burglary was not based on proof of guilt beyond a reasonable doubt and (2) that the admission of testimony relating to another offense which defendant allegedly committed in the identical premises here involved was prejudicial.

The record indicates that at 4:45 in the morning of October 13, 1971, Police Officer Lantka noticed that there was a light on in the living quarters of Mrs. Agamy, who conducted a store in the same premises. The officer checked all entrances to the building and noticed that they were locked and undisturbed. He also checked the coal chute and found that it was open. He radioed for assistance and an off-duty policeman joined him shortly.

Officer Lantka then went into the basement through the coal chute and made a thorough search of the basement. During his search, with a flashlight, he observed the door leading into the first floor business section of the house, and noticed that the door was closed. He also checked behind a door which was not being used, but which was leaning against the wall and was disfunctional, and found nothing behind it. The policeman then rejoined the other officer by coming out through the coal chute.

While Officer Lantka was in the basement, the other officer radioed the dispatcher to telephone Mrs. Agamy. After the telephone started to ring and Officer Lantka came out of the coal chute, the light in the living quarters went out. One of the officers radioed to have the telephone call stopped. The officers then knocked on the front and rear doors, calling out that they were police and calling for Mrs. Agamy to find out if she was all right. There was some evidence that the policemen could hear a noise and could see the rear doorknob turning.

Officer Lantka then re-entered through the coal chute and walked, with pistol drawn, toward the rear entrance to the basement. He noted a shiny object and called, "Mrs. Agamy, is that you? I'm a police officer." As he walked closer he saw that the shiny object was a knife and that someone was holding it and hiding behind the disfunctional door. The officer saw what turned out to be a part of defendant's right arm and lower leg protruding from behind the disfunctional door, which was leaning against the wall. The officer called to the defendant three times

to drop the knife, and, following the third call, the knife started to come up a little. The officer then told defendant to drop the knife or "I'll blow your head off". Defendant Henderson dropped the knife. The officer then walked to the back door, unbolted it and opened it. He told defendant to get up slowly and walk out of the basement. At that time, the officer testified, Mr. Henderson's hand was covered in the fashion of a glove by a white sock with a red and black band near the top. Defendant had no socks on his feet although he was wearing shoes. Defendant had some blood visible on him and had a slight head injury. It was noted that the basement ceiling and pipes are low.

The defendant was placed in the squad car and said: "Is she all right. I was just coming by to help her. Is she all right." The officers then went back into the basement and upstairs and noticed that there were many items scattered on the floor. The cash register door was drawn out and there were papers all around it. The officers then went to the living quarters where they found Mrs. Agamy's body on the bed. There were papers all over the floor, the dresser drawers were open, and there was blood on the floor. A police officer checked the remaining windows and entrances and returned to the squad car.

After defendant had been advised of his constitutional rights he agreed to talk without a lawyer and asserted that he was walking along in back of the store and heard Mrs. Agamy call for help. He stated he had been over playing pool across the street and wanted to know whether Mrs. Agamy was all right. He stated he simply wanted to help. At the time, defendant was quite disheveled and smelled strongly of intoxicants. Defendant stated that he had been at a tavern and left about 12:30 A.M. after having two or three beers. He said he walked to his auto and picked up his knife from under the seat. There was no explanation of for what purpose he picked up his knife. Defendant stated he then started toward the alley behind the Agamy building to walk to another tavern at which time, he stated, he heard Mrs. Agamy call for help. He said he saw no one but did see a light at the rear of her building. He said he saw the rear basement door standing open and that he entered through that door and stopped to close the door behind him. He said he thought he closed the door tightly, but thought he did not lock the door behind him. He said he then walked two or three more steps into the basement when suddenly someone struck him in front over the top of his head, and that he was unconscious until he heard the police calling to Mrs. Agamy, identifying themselves as police.

The autopsy which was performed on Mrs. Agamy's body indicated that she was scratched; had a black eye; her nose was broken; she had a broken rib; a contusion on the lung; and a hemorrhage around the kidney.

Her heart indicated signs of a previous heart attack. The pathologist's opinion was that the traumas and injuries were not severe enough to cause her death. A medical opinion was given that the shock or fright might have caused an outpouring of adrenalin which speeded up the heart causing fibrillation which caused the death of Mrs. Agamy.

A number of tests were made which disclosed that the blood found in Mrs. Agamy's room was her type of blood and that none of that type of blood was found on defendant Henderson or his clothing. A number of weeks after the incident, a white sock with a black and red band around the top was removed from a spare bedroom located next to Mrs. Agamy's bedroom, and the hair found inside that sock was similar to the ankle hair of defendant Henderson.

At the trial, Walter Countryman testified, over a defense objection, that previously, on October 10, 1971 (just 3 days prior to the night defendant was apprehended in the premises), he and defendant Henderson broke into Mrs. Agamy's premises and took $700 from her safe and cash register. She was asleep at the time. Countryman admitted he had been promised a probation recommendation if he testified. He had left town immediately after the October 13, 1971, date. When Countryman returned a week later he first told police he had never been in the Agamy establishment. There was also testimony of two witnesses who indicated that defendant Henderson had left the Hideaway Tavern at about 8:30 P.M. rather than at the time to which he testified.

As indicated, the jury returned a verdict of not guilty on the felony-murder count but found defendant guilty on the burglary count. Defendant contends that there was not sufficient proof of his guilt of burglary beyond a reasonable doubt. The argument is premised upon the alleged failure of the State to prove that defendant had entered upon the premises with intent to commit theft. The State countered by pointing out that circumstantial evidence may be used for the purpose of establishing intent from conduct itself. The State points out that proof of unlawful entry into a building which contains personal property which could be the subject of larceny could give rise to an inference that will sustain the conviction of burglary in the instant case. (*People v. Polansky*, 6 Ill. App.3d 773, 287 N.E.2d 747; *People v. Johnson*, 28 Ill.2d 441, 192 N.E.2d 864; *People v. Thompson*, 48 Ill.2d 41, 268 N.E.2d 369.) Defendant contends that there was no specific proof that he had been on the first floor and out of the basement. Hair discovered on the inside of the white crew sock found on the first floor, however, did match the type of hair found on defendant Henderson's ankles.

■■ Defendant contends that, while intent can be inferred from unauthorized presence in a dwelling, the other evidence raises sufficient

facts to negate the inference of an intent to commit a felony principally because no property was taken from Mrs. Agamy. No property, however, need be taken to sustain a conviction of burglary (*People v. Gooch*, 70 Ill.App.2d 124, 263 N.E.2d 603; *People v. Figgers*, 23 Ill.2d 516, 179 N.E.2d 626). As triers of fact, the responsibility rests with the jury to determine which of the conflicting testimony of witnesses is to be believed (*People v. Umphers*, 133 Ill.App.2d 853, 272 N.E.2d 278). Defendant cites *People v. Dougard*, 16 Ill.2d 603, 158 N.E.2d 596, in support of the contention that the facts must so thoroughly establish the guilt of the person accused as to exclude every reasonable hypothesis of guilt and that, even though jurors are judges of the weight of the evidence in criminal cases, the court should reverse the judgment of a conviction resting upon circumstantial evidence that raises a little more than a suspicion against an accused. The principle announced in the *Dougard* case, however, is not applicable to the facts in the case before us. The evidence against defendant is strong and found convincing by the jury. The record shows that Officer Lantka first searched the basement and that defendant Henderson was not there and, also, that the door at the top of the stairs was closed. The officer found nothing behind the non-functional door, where Henderson was later found to be hiding, armed with a knife. On the second search by Officer Lantka, the door at the top of the stairs was ajar 6 or 7 inches. Defendant, as noted, was then found hiding behind the nonfunctional door which was leaning against the wall and defendant was holding his knife in the threatening position. Also, hair found with blood on the thigh of defendant's pants was similar in color and characteristics to the head of hair standard of the hair of Mrs. Agamy.

It was impossible for anyone to have left the premises after the officer arrived because of the arrangement of the premises and the exits and the presence of the officers. If defendant had been knocked unconscious, as he claimed, he would have been found by Officer Lantka when the officer made the first search before the light in the living quarters was turned off. No one could have entered or left the building after Officer Lantka had arrived without being seen and no one else was observed.

■■ The jury obviously did not believe defendant's Good Samaritan story, and found it to be inconsistent with other facts, as the jury was entitled to do. It is properly noted by the State that defendant's story could have fallen in the category of other excuses for presence in a place where a crime is committed which a jury found incredible. (*People v. Gooch*, 70 Ill.App.2d 124, 263 N.E.2d 603; *People v. Umphers*, 133 Ill.App.2d 853, 272 N.E.2d 278; *People v. Brown*, 131 Ill.App.2d 717, 263 N.E.2d 603.) We believe that the jury had ample evidence upon which

to base the jury verdict and that it was adequately supported by evidence upon which proof beyond a reasonable doubt of intent to commit a theft could be sustained.

■■ As we have indicated, the evidence of Walter Countryman was to the effect that on October 10, 1971, 3 days prior to the incident for which defendant Henderson was being tried, he and Henderson had entered the Agamy establishment and stolen $700 from the safe and cash register. The trial court out of the presence of the jury, had considered the question of allowing such testimony carefully before allowing Countryman to testify. Decisions which were cited to the trial court, *People v. Allen,* 1 Ill.App.3d 197, 272 N.E.2d 196, and *People v. Barnes,* 2 Ill.App.3d 461, 276 N.E.2d 509, indicated that evidence which discloses that accused committed crimes, other than the one charged in the proceeding in which such evidence is tendered, would be admissible where such evidence is relevant to the contested issue in the case before the court. In the *Barnes* case the court indicated that the evidence was properly admitted for such probative value even though it could have some prejudicial effect. The trial court indicated that defendant either went into the place, as he stated, when the lady called out for help, or he went in there to commit burglary. The court then concluded that the evidence of Countryman was pertinent even though it might be prejudicial and that it should be presented to the jury. We agree that normally such evidence of commission of a separate crime should not be admitted unless its probative value outweighs its prejudicial effect.

■■■ The problem before the court when such evidence is tendered is to weigh the probative value of the evidence of another crime as against its prejudicial effect. This is clearly left to the sound discretion of the trial judge (*People v. Norfleet,* 4 Ill.App.3d 758, 281 N.E.2d 761; *People v. Clark,* 104 Ill.App.2d 12, 244 N.E.2d 842; *People v. Kovacivich,* 10 Ill.App.3d 797, 295 N.E.2d 33). The trial court in the instant case properly weighed the issue of whether the evidence was or was not admissible on the basis of whether its probative value outweighed its prejudicial effect, and determined that it was admissible. Since the evidence of Countryman was to the effect that a burglary of the same premises by defendant had occurred 3 days previously and had netted $700 to defendant and Countryman, the court determined that the probative value outweighed the potential prejudicial effect. We believe the court properly exercised its sound discretion under such circumstances, and that the evidence tended to prove intent and the guilt of the accused for the crime of burglary for which he was being tried, in view of the other supporting evidence to which we have referred. We, therefore, conclude

that there was no reversible error in permitting the introduction of the testimony of Walter Countryman.

Since we find no reversible error in the record, the judgment of the Circuit Court of Will County and the 2-to-6-year sentence imposed are affirmed.

Affirmed.

SCOTT, P. J., concurs.

Mr. JUSTICE STOUDER dissenting:

In my opinion the admission of evidence tending to show defendant committed a separate offense was error in the present case.

The rule is well settled that during prosecution for a particular crime, evidence showing or tending to show the accused committed another crime wholly independent of and unconnected with that for which he is being tried is irrelevant and inadmissible. (I.L.P. *Criminal Law*, sec. 301.) Such evidence is not considered relevant because it merely tends to show a propensity to commit criminal offenses and is not a basis for an inference that the accused committed the crime in question. (Gard, *Illinois Evidence Manual*, Rule 89.) An equally significant reason for excluding evidence of other offenses is the desirability of excluding collateral issues. A defendant ought not be required to defend himself against charges of a criminal offense for which he is not being tried and for which he may not have been charged. An exception to the exclusionary rule permits admission of other offenses if there is a connection between the other offense and the offense charged or where such evidence tends to prove a material fact in issue. In either case the evidence is deemed to be relevant. Common examples include evidence which shows identity of the person committing the crime, absence of mistake or accident, common design or plan, conspiracy, proximity, motive, intent or knowledge. The reasons for excluding evidence of other unrelated crimes commend a broad application of the exclusionary rule and correspondingly the same reasons warrant a limited application of the exception.

The majority suggests that Countryman's testimony regarding the other offense falls within the exception to the exclusionary rule because the evidence tended to prove intent and guilt of defendant. I am unable to see any such tendency. The two offenses appear to be completely independent of one another and no similarity between them is alleged by the State other than the fact that both involved the same building. Evidence tending to show intent to commit a crime on one day should not be used as a basis for inferring that one has an intent to commit a separate crime

several days later without some connecting factor linking the two occasions. If such an inference is made, the most that can be said is that defendant has a propensity for committing crime. According to the rule if this is the only purpose for admitting the evidence, it is inadmissible.

In Callaghan's *Illinois Evidence,* 1973 Supplement, volume 4, section 5.38, it is stated that irrespective of the exceptions to this exclusionary rule, evidence of other criminal activity is not admissible where minor probative value is outweighed by major prejudicial effect. See also People v. Butler, 133 Ill.App.2d 299, 273 N.E.2d 37, and McCormick, Handbook of the Law of Evidence, ch. 17, sec. 190 (2d ed. 1972).

In determining the probative value of evidence, not only should relevancy of the evidence be considered but also its reliability. The testimony of the State's witness, Countryman, in the instant case appears weak in both respects. Evidence of a break in and theft of $700 from the Agamy establishment 3 days prior to the crime presently charged was not corroborated. No police record was offered by the State. Also, the fact that probation was recommended in exchange for Countryman's testimony reduces its reliability. In considering relevancy, again I point out nothing said by Countryman suggests a connection or relationship between the two crimes nor does evidence concerning the other offense have a tendency to prove a material fact in issue in the case at hand.

The prejudicial effect of the testimony is obvious. A collateral issue is interjected which detracts the jury's attention from the real issue. Defendant is required to defend against a crime with which he has not been charged. Oftentimes too much weight is given to such evidence whereby the jury is apt to convict because it believes defendant is an evil person or because defendant is believed to be guilty of some crime even though perhaps not of the specific offense for which he is being tried. The court must not lose sight of the underlying policy of protecting the accused against unfair prejudice. In my opinion even if the evidence presented by Countryman could be considered within an exception to the rule, any possible probative value is greatly outweighed by the prejudicial effect upon the defendant and should not be admitted.

I believe the reliance by the trial court and the majority on *People v. Allen,* 1 Ill.App.3d 197, 272 N.E.2d 296, is misplaced, not only because the facts are substantially different, but because the *Allen* case represents a departure in applying the exception to the general prevailing exclusionary rule. In *Allen,* the defendant was charged with robbery and admitted being on the premises at the time but denied any participation with two others who actively committed the offense. The defendant called one of the admitted participants in the offense as his witness and such witness in his testimony-in-chief indicated the defendant was not

a participant in the robbery. On cross-examination it was elicited from the witness that 4 days subsequent to the date of the offense for which the defendant was charged, the witness and the defendant had committed another robbery. Although the court in its opinion indicates that the primary purpose of the evidence of the subsequent offense was to "discredit" the equivocal testimony of the defendant by impeaching the witness' testimony and indirectly that of the defendant, ordinarily impeachment is limited to proof of conviction of another offense rather than evidence of the offense itself.

While I have no quarrel with the decision of the majority on sufficiency of the evidence for the conviction, I believe admitting the evidence tending to show a separate unconnected offense deprived defendant of a fair trial.