THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
PHILLIP McVAY, Defendant-Appellant.

Third District    No. 80-320

Opinion filed July 28, 1981.

Robert Agostinelli and Stephen Omolecki, both of State Appellate Defender's Office, of Ottawa, for appellant.

James T. Teros, State's Attorney, of Rock Island (John X. Breslin and Gary F. Gnidovec, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE ALLOY delivered the opinion of the court:

Defendant Phillip McVay appeals from his conviction, following a jury trial, for the offense of burglary. The defendant was sentenced to two years' probation, with the first 180 days to be served in the county jail. On this appeal, the defendant contends: (1) that he was not proven guilty beyond a reasonable doubt because of the unreliability of the State's principal witnesses; (2) that he was denied a fair trial because of the improper and prejudicial statements of the prosecutor during closing argument; (3) that he was denied a fair trial when the court failed to grant his motion for a severance from a co-defendant for trial, where the State presented an admission by the co-defendant which implicated the defendant in the commission of the crime; (4) that the court committed reversible error in refusing to give an instruction tendered by the defense; and (5) that the court erred in instructing the jury on the admissibility of the co-defendant's admissions as to defendant McVay.

The record reveals that on January 29, 1980, one Jeffrey Booth returned to his home shortly after 1:30 in the afternoon. Inside his home he found co-defendants John Reed and Phillip McVay. Both McVay and Reed were recent acquaintances of Booth, and both had been in his home previously with his permission. When Booth inquired of them what they

were doing in his home, the men answered that they were looking for him. Although upset with their presence, Booth and the two sat down, over coffee, and talked. After 15 minutes, Reed and McVay left. Booth testified at trial that he did not give them permission to enter the house and that when he left, earlier that morning, the door and windows to his home were locked and secure. Booth testified that there were pry marks and other evidence of forcible entry on a front window of the house.

After Reed and McVay had left, Booth checked upstairs on his and his wife's valuables. He found he was missing a watch and that his wife's jewelry box was not in its usual place in the dresser drawer. Later, after determining that the watch and several of his wife's necklaces were missing, Booth, accompanied by his wife, went over to the McVay residence. There present were John Reed, Phillip McVay, and Cindy McVay, Phillip's sister. Booth told the two men that if he did not get his belongings back from them, he would notify the police. McVay and Reed both denied any knowledge of the belongings. Booth then informed the police of the missing items and of the events of that afternoon. The cross-examination of Jeffrey Booth focused upon his private life and his relationship to the defendants. His financial problems were explored, as was an extramarital affair with a Kathy Hook.

Booth admitted to a problem with alcoholism and to prior drug use, although he denied any drug addiction. He also admitted to having locked himself out of his house on a date prior to the burglary. On that occasion, with the help of Phillip McVay, who was with him then, he had gotten into the house by entering through a jimmied front window. Further impeachment took the form of indicating various discrepancies between Booth's pretrial statements to police and his testimony at trial. The clear implication in the defense attack on Booth's credibility was that Booth's purpose in bringing charges against Reed and McVay was to cover up his own problems and perhaps to get insurance proceeds for the missing items.

Booth also identified, during his testimony, several exhibits offered into evidence by the State. Included in the exhibits were three rings belonging to him and recovered from possessions belonging to John Reed, which had been stored at the McVay residence (as well as a key to the Booth residence). The items were also identified by Mrs. Booth, whose testimony corroborated her husband's with respect to the missing items. She also testified that she was aware of her husband's affair with Kathy Hook and of his drug and alcohol problems. She was, as was her husband, acquainted with both defendants, Reed and McVay.

Various investigating officers also testified for the State. One officer testified to the presence of pry marks on the outside of the front window of the Booth residence. Two other officers testified to their arrest of

subjects Phillip McVay and John Reed, at the McVay residence, on the night of the burglary. Their testimony was that Phillip McVay, upon seeing them at the top of the stairs, ran toward the front part of the building.

Another witness for the State was Cindy McVay, 16-year-old sister of Phillip McVay. Cindy had previously been a girlfriend of the co-defendant John Reed. Prior to her testimony, however, defendant's counsel renewed an objection to her testimony which he had made prior to trial. On the morning of the scheduled trial, defense counsel for Phillip McVay informed the trial judge that he had just learned of some new evidence in the case which the police had obtained the previous Thursday. Included in that evidence, were certain statements allegedly made by defendant John Reed to Cindy McVay concerning the burglary and trial. According to defense counsel, those statements tended to incriminate John Reed and also implicated co-defendant Phillip McVay in the crime. Defense counsel stated that although the statements did not expressly name Phillip McVay, they were of such nature that, when combined with the other evidence, the jury would most likely consider the statements against McVay as well as Reed, even if a cautionary instruction were given.

Based upon the incriminating statements by Reed, which allegedly implicated McVay, defense counsel moved for a severance for trial. The trial judge, acknowledging that the situation was one to be concerned about, nevertheless denied the motion to sever, opining that a cautionary instruction would negate any possible prejudice. He also stated that he felt that, if anything, the situation would benefit the defendants in that the jurors could become confused and return a not guilty as to them both. Later, at trial, when defense counsel renewed his objection to Cindy McVay's testimony, based upon the severance issue, the trial judge overruled the objection, stating that he felt the jury understood that testimony against one defendant did not automatically apply to both defendants. He then instructed the jury that "testimony against so to speak one defendant isn't necessarily testimony against the other. That's for you to decide." Following the judge's ruling, Cindy McVay testified that she had received a phone call from John Reed the Thursday before trial, in which Reed told her that there were no hard feelings between them, but that if he, Reed, went down (was convicted), so would both she and her brother, Phillip McVay. As a result of the call from Reed, Cindy McVay went to the police and turned over to them a key, three rings and a watch, later admitted into evidence against the defendants. Concerning the items, Cindy McVay testified that they were from a jewelry box located among John Reed's clothes, which were stored in the attic of her mother's house. She testified that a couple of days after John Reed's arrest for the

burglary, Reed called her and told her to remove some items from the glove compartment of his truck so that the police would not find them. It was those items, later turned over to the police, that Cindy stated she removed from the glove compartment and put with Reed's clothing in the attic. The rings and the key were offered into evidence against the defendants.

The final witness for the State's case in chief was a police officer who had taken Cindy McVay's statements concerning the stolen items removed from Reed's truck. He testified to that conversation with Cindy McVay and also testified to the fact that the key given him by Ms. McVay unlocked the exterior door to the Booth residence. At the close of the State's case, directed verdict motions were denied.

A principal thrust of the defense presentation in the case was a sharp attack upon the credibility of both Jeffrey Booth and Cindy McVay. Two younger brothers of Phillip McVay testified that they were acquainted with Jeffrey Booth and had been present when he had to pry open the front window of his home using a knife. They also testified that they were present when Booth pawned a watch in Rock Island. They testified that Booth once had asked them to steal from Kathy Hook a necklace he had given her, which he now wanted back. They testified that Booth had consumed alcoholic beverages with them previously and that he had offered them narcotic drugs. Both testified that they had seen Booth use drugs. They also testified that they had observed the police search of John Reed's truck on the night of the arrest, and one boy testified that the glove compartment was searched that night.

Janice McVay, mother of all the McVays involved in the case, also testified for the defense. She testified that she had observed a police search of John Reed's truck on the night of the arrest and that it appeared that they were going through everything with flashlights. She also testified that her daughter, Cindy, a principal witness for the State, had been diagnosed as a borderline mentally retarded child. She described her daughter as living "in and out of a fantasy world." She stated that one could not believe everything Cindy said. To contradict Cindy's testimony about the early telephone call from John Reed, Mrs. McVay testified that she had no phone at her home and that Kathy Hook's apartment, downstairs, did not have a phone until recently, certainly subsequent to the time her daughter claimed to have received the first call from John Reed concerning the items in the glove compartment of his truck. Mrs. McVay also testified that she had gone through Reed's belongings in the attic and had not noticed any jewelry box during her examination.

Kathy Hook was also a defense witness. She testified to her affair with Jeffrey Booth, to the gifts of necklaces which he had made to her during that affair, and to their drug intake during the affair. She said that

she and Booth used drugs almost every time they were together, over a period of six months. She admitted to her own drug addiction during that period of time. Kathy Hook testified that on the day of the burglary, Booth had told her about it and said that he had to report a burglary, or else his insurance company would not honor his claim.

The final witnesses for the defense were the defendants. According to their testimony, they had been shopping together on the morning of January 21, and when they returned to the McVay house they learned that Jeffrey Booth had stopped there for them. He had told them the day before that he might need a ride to the doctor's office, so they thought that this was his reason for stopping by that morning. Booth did not have a car and, according to Reed, he (Reed) had given him rides previously. Reed and McVay then walked over to Booth's house, since Reed's car was low on gas, and they entered through an unlocked front door. They did not see Booth until they had started up the stairs, at which time he appeared from the kitchen carrying a cup of coffee. After some chitchat, they left.

Both Reed and McVay denied taking anything from the Booth residence. Reed denied any call to Cindy McVay concerning the stolen items and their presence in his truck. He also denied that his call to her shortly before trial contained any statement that she and Phillip would be convicted with him, if he were convicted. He stated that the call was merely for the purpose of having Cindy get a suit for him to wear at court. Cross-examination of the defendants brought out various inconsistencies between their trial testimony and that given the police previously. Also, various rebuttal and surrebuttal witnesses were called, but their testimony need not be set forth, as it is not necessary to the decision of this court on appeal. After argument and instructions, the jury retired to deliberate and later brought back guilty verdicts.

■■■ The first issue which we address is defendant McVay's contention that the State did not prove him guilty beyond a reasonable doubt. The basis for this argument is his assertedly believable explanation of his presence in the Booth home, and, more importantly, the incredibility and insufficiency of the testimony by Booth and Cindy McVay. It is firmly established, however, that questions concerning the credibility of the witnesses and the weight to be afforded contradictory testimony are for the trier of fact to decide. (*People v. Henderson* (1974), 18 Ill. App. 3d 457, 309 N.E.2d 242.) Where a jury had made a determination based upon conflicting testimony, a reviewing court will not disturb that decision unless the evidence is so improbable as to raise a reasonable doubt as to the defendant's guilt. (*People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313; *People v. Lawson* (1978), 65 Ill. App. 3d 755, 382 N.E.2d 878.) We have fully reviewed the evidence presented, and while certainly the State's case has weaknesses and the character and credibility of Jeffrey

Booth and Cindy McVay are open questions, such matters were properly for the jury to assess and determine.

We do not find, as a matter of law, that their testimony is incredible and not to be believed. When credibility questions are resolved in favor of the State, as was the obvious decision of the jury in this case, we find that the evidence was sufficient to show guilt beyond a reasonable doubt. No reversal on this issue is warranted. However, due to substantial and serious error, we do reverse the conviction of Phillip McVay and remand his cause for a new trial.

■■ The reversible error committed by the trial court was its denial of McVay's motion for a severance, based upon the State's intended use of admissions by co-defendant John Reed, which implicated McVay in the crime. The rules concerning severance in this situation are well delineated and of long standing authority, expressed as follows:

> "The general rule is that those indicted jointly for the commission of a crime are to be tried together, and the matter of granting a separate trial is within the sound discretion of the trial court. * * * But this is a judicial and not an arbitrary discretion, * * * and where the circumstances are such that a defendant will be deprived of a fair trial if jointly tried, a severance must be ordered. * * *. Confessions or admissions made by an accomplice outside the presence of a defendant are not admissible against the latter whether or not the parties are jointly tried, and we have repeatedly held that when a motion for separate trial is based on the fact that a codefendant's confession implicates the moving defendant, a severance should be granted unless the prosecution declares that the admissions or confessions will not be offered in evidence at time of trial, or if offered, that there will be eliminated therefrom any and all reference to the party applying for a severance. * * *." (*People v. Clark* (1959), 17 Ill. 2d 486, 489-90, 162 N.E.2d 413; *People v. Miller* (1968), 40 Ill. 2d 154, 158-59, 238 N.E.2d 407.)

In both *Clark* and *Miller*, the supreme court reversed the convictions based upon the trial court's failure to grant a defense motion for a severance where admissions by a co-defendant implicated the defendant. Also, in both cases, the court concluded that reversal was required despite a cautionary instruction given concerning the evidence. (*People v. Miller* (1968), 40 Ill. 2d 154, 158-59; *People v. Clark* (1959), 17 Ill. 2d 486, 492.) As noted by the court in *Clark*, "* * * despite the court's efforts to prevent injustice by cautionary instructions as to limitations on the evidence, the prejudicial effect of the codefendant's confessions inevitably remained. * * *." (17 Ill. 2d 486, 492.) The basis for this long-standing rule requiring severance in such situations is the constitutional guarantee of a fair and impartial trial and the conclusion, founded on the plainest principles of justice, that admission of a co-defendant's statement implicating the other

party defendant works a substantial and unfair prejudice on the other party. See *People v. Sweetin* (1927), 325 Ill. 245, 252, 156 N.E. 354; *People v. Buckminster* (1916), 274 Ill. 435, 445-46, 113 N.E. 713.

■■ ■ While the usual case involves an admission directly implicating a co-defendant, the confession or admission need not directly or expressly name a co-defendant, so long as the incriminating implications clearly point toward a co-defendant's guilt. (*People v. Clark* (1959), 17 Ill. 2d 486, 491-92; *People v. Serritello* (1944), 385 Ill. 554, 558, 53 N.E.2d 581.) In assessing the incriminating implications for a co-defendant named in another defendant's admission, the admission must be viewed in the context of the State's other evidence. (*People v. Clark* (1959), 17 Ill. 2d 486, 491-92; *People v. Hudson* (1970), 46 Ill. 2d 177, 263 N.E.2d 473.) In *Hudson*, the test applied was whether the admission by a co-defendant readily leads to an incriminating conclusion against the defendant. 46 Ill. 2d 177, 196. See also *People v. Mosher* (1949), 403 Ill. 112, 115, 85 N.E.2d 658.

Our initial inquiry is whether the statements made by John Reed and offered into evidence by the State were of such nature, either alone or in association with the State's other evidence, so as to clearly implicate McVay in the commission of the burglary. The State's evidence indicated that Reed called Cindy McVay shortly after his arrest and told her to remove certain jewelry items from the glove compartment of his truck, so that the police would not find them. The other evidence at issue was Reed's statement, made to Cindy McVay, that she and Phillip McVay would "go down with him." The State argues that there was nothing in the statements made by Reed which necessarily implicated Phillip McVay in the commission of the offense. We disagree. While, on their face, neither statement expressly indicates McVay's participation in the burglary, when the statements are examined in light of the other evidence, it is clear that the statements readily lead to an incriminating conclusion against Phillip McVay. The State's case inextricably linked McVay and Reed as accomplices in the commission of the burglary.

■■ ■ The evidence put both men together in the Booth residence, without authority, on the afternoon of the burglary. Given this essential association of the co-defendants, there was no way for the jury not to draw incriminating conclusions as to McVay from Reed's admitted possession of the stolen items. Reed's other statement, that they would all "go down" together if he "went down," recognizes their close association. It also, in its indirect reference to Phillip McVay, implicates him in the commission of the crime. We find that the statements were antagonistic to McVay's position at trial and that they readily lead to an incriminating conclusion against him. The trial judge recognized the prejudice to McVay inherent in the statements, but he felt that it could be cured by a

cautionary instruction. As indicated above, cautionary instructions are insufficient to combat the prejudice flowing from the introduction of such evidence.(*People v. Miller* (1968), 40 Ill. 2d 154, 158-59; *People v. Clark* (1959), 17 Ill. 2d 486, 492.) As to the court's statement that benefit to the defendants could result, because the jury might become confused and so find both not guilty, we find it not helpful. We fail to note how, in any way, the statement by Reed implicating McVay could operate to McVay's benefit. In conclusion, we find that the trial court should have granted the severance requested by Phillip McVay prior to trial, based upon the State's intended use of Reed's admission and statements which implicated McVay in the crime. The State made no offer to refrain from using the statements or to delete reference to McVay, if possible. Refusal to grant a severance, under these circumstances, constituted reversible error, and the cause will be reversed and remanded for a new trial.

■■ The fact that Reed testified at trial and, therefore, McVay's counsel had an opportunity to cross-examine him concerning the statements, does not change that conclusion. While the severance rule established and stated in *Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620, rested on a defendant's right to cross-examination as secured by the confrontation clause, the Illinois rule requiring severance in such situations far antedates *Bruton* and is premised upon fundamental principles of justice and the defendant's right to a fair trial and not merely upon a violation of the right to confront adverse witnesses. (*People v. Sweetin* (1927), 325 Ill. 245, 252, 156 N.E. 354; *People v. Serritello* (1944), 385 Ill. 554, 558, 53 N.E.2d 581.) Even with the ability to cross-examine, the prejudice to a defendant from the incriminating admission by a co-defendant remains, and a severance should be granted.

The dissent in this case evidences a disapproval of this "fair trial" basis for requiring severance, but it does not dispute the fact that such a basis has been long established in the opinions of the Illinois Supreme Court. Furthermore, the dissent, in seeking to distinguish *People v. Clark* and *People v. Miller*, and in seeking to bring the case within the confines of *People v. Ross* (1968), 41 Ill. 2d 445, focuses upon the least incriminating statement by Reed. It ignores the other statement, and it also examines the chosen statement removed from the context of the State's other evidence. As noted previously, the implications from a co-defendant's statement must be viewed in the context of the State's other evidence and from its case against the defendant. The *Ross* case is not controlling because in it the court found that the objected-to statement did not implicate the defendant. In this case, as discussed, the statements by Reed, viewed in the context of the State's case against McVay, did lead to an incriminating conclusion as to McVay. Even the trial judge, as already noted, recognized the prejudicial effect of the evidence as to McVay, but

he felt it could be cured by a limiting instruction. Clearly, such instruction has been held insufficient. McVay's rights to a fair trial were denied him, and the conviction should be reversed.

■■ Given our reversal and remandment for a new trial, we need not reach the asserted errors by the prosecution in its closing argument. We will, however, touch upon an asserted error with the instructions. The defense contends that the court erred in not instructing the jury that the testimony of an addict is to be carefully scrutinized. The defense argues that the instruction was appropriate and necessary where the evidence showed that Jeffrey Booth was a drug user. The trial court found that giving the instruction would place undue influence on the witness' drug use and also that there was insufficient evidence to indicate Booth's addiction to narcotics. We find that refusing to give the instruction, a non-IPI instruction, was proper and without error. *People v. Collins* (1977), 48 Ill. App. 3d 643, 648, 362 N.E.2d 1118.

The judgment of conviction by the Circuit Court of Rock Island County is reversed and the cause is remanded for a new trial.

Reversed and remanded.

SCOTT, P. J., concurs.

Mr. JUSTICE HEIPLE, dissenting:

The majority concludes that the trial court's denial of defendant's motion to sever was an abuse of discretion. In so doing, it misconstrues the applicable law in Illinois. I dissent.

*People v. Ross* (1968), 41 Ill. 2d 445, *cert. denied* (1969), 395 U.S. 920, 23 L. Ed. 2d 237, 89 S. Ct. 1771, is authority for the general rule that where one or more defendants are jointly indicted for the commission of a crime, they are to be tried together; and whether a separate trial should be granted is largely within the sound judicial discretion of the trial court. In *Ross*, Ross and Pawlak were jointly tried for arson. Prior to his second trial, Ross moved to sever his prosecution from that of Pawlak. The basis for the motion was a conversation between a police officer and Pawlak where the officer suggested to Pawlak that a co-indictee, Mauricaux, had discussed with her Ross' participation in the crime. To this Pawlak replied, "* * * Yes, but you don't believe him, do you? * * *" Relying on *Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620, the Illinois Supreme Court found no prejudice in a joint prosecution, since Pawlak's admission did not directly involve Ross in the crime, but was merely evidence of association with Pawlak. Additionally, the court noted that Pawlak took the witness stand and was subject to cross-examination concerning the statement.

In the case at hand, the basis for Phillip McVay's motion, filed on the day of trial, was his sister's testimony that co-defendant, John Reed, had telephoned Cindy McVay a week before trial and said if he (Reed) "went down," she and Phillip would "go down" with him. The next day Cindy McVay contacted the police and turned over several items stolen from the Booth household.

*People v. Clark* and *People v. Miller*, both of which predate *Bruton*, and upon which the majority relies, are not germane to this cause for two reasons. First, both these cases contained clear admissions by co-defendants which implicated a co-defendant in the crime charged. Secondly, the majority's magnanimous "fair trial" approach is fraught with ambiguity.

Like Ross, McVay's motion for severance was properly denied. The fact that John Reed reportedly said that Phillip, as well as Cindy McVay, would "go down" with him does not directly implicate the defendant or his sister in the crime. While the statement might be considered a threat of sorts, it is not evidence of any wrongdoing on Phillip McVay's part. Such a remark does not detail McVay's role in the crime, nor does it identify him as an accomplice in the burglary. In a word, it was not incriminating. More importantly, Reed was available for cross-examination, since he took the witness stand.

I find equally erroneous the majority's conclusions that denial of defendant's severance motion violated McVay's right to a fair trial in an even broader sense than they feel is indicated by *Bruton*. The majority's view of this theory is not only undefined, but is problematic as to the scope of its application. A defendant's sixth amendment right to a fair trial, as well as his rights after indictment under the Illinois Constitution, are essentially the same. Succinctly enumerated, the constituent parts of a "fair trial" include impartial local jury, speedy trial, right to counsel, subpoenaing witnesses, apprisal of the nature of the charge, and confrontation and cross-examination of witnesses. Only the right to confrontation and cross-examination is alleged violated in this cause. McVay neither argued nor briefed the infringement of any other sixth amendment guarantee.

The majority, in reaching out for a "fair trial" concept, grounded in "fundamental principles of justice," as the basis for reversal, oversimplifies the breadth of the specific guarantees the sixth amendment incorporates. Such reasoning parallels a medical diagnosis that finds a patient "sick" and then commits him to the hospital. If the patient is truly "sick," it is due to a specific disease or ailment. So it is with the majority's "fair trial" theory. And quite apart from its wrongness, it lacks definition, analysis and critical diagnosis.

The Illinois Supreme Court has explicitly referred to the confrontation clause as the guarantee invoked by the *Bruton*-type challenge McVay

720

advances in his motion to sever. (*People v. Ross* (1968), 41 Ill. 2d 445, 461-62.) Unlike *People v. Clark* (1959), 17 Ill. 2d 486, which the majority cites to sustain its "fair trial" theory, the *Ross* opinion positively refers to *Bruton* as the source for its holding denying Ross' motion to sever. In so doing, the more limited confrontation clause argument, akin to that which McVay argues, is rejected. The majority's "fair trial" theory is not addressed. It is beyond argument that if such a view is the law, the supreme court was compelled to discuss it since such a conception of the right to a fair trial necessarily encompasses a greater spectrum of rights than just confrontation and cross-examination of witnesses. Because it was not, I believe *Clark*, as well as *People v. Miller* (1968), 40 Ill. 2d 154, should not be followed.

The trial judge, who was in the best position to gauge the effect the remark had on the jury, gave a limiting instruction to the jury as to the pertinent use of the remark. Also, as indicated, Reed testified, thereby allowing cross-examination as to the statement's purpose, as well as its suggestions, in the context uttered. Any prejudice was thus defused. I cannot subscribe to the majority's catchall "fair trial" view since the guarantee of confrontation and cross-examination was not violated in this cause. McVay received a fair trial. He may not have received a perfect one; but perfect trials are not mandated and should not be expected.