THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JAMES L. SMITH, Defendant-Appellant.

Third District   No. 3—90—0819

Opinion filed October 10, 1991.

Robert Agostinelli, of State Appellate Defender's Office, of Ottawa, and Daniel D. Yuhas, of State Appellate Defender's Office, of Springfield, for appellant.

William Herzog, State's Attorney, of Kankakee (John X. Breslin and Gary F. Gnidovec, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE McCUSKEY delivered the opinion of the court:

A jury convicted the defendant, James L. Smith, of the first degree murder of Thomas Ellis (Ill. Rev. Stat. 1989, ch. 38, par. 9—1). The trial court subsequently sentenced him to 23 years' imprisonment. The defendant appeals. We affirm.

The record shows Hosea Whitelow testified he was Thomas Ellis' stepson. On December 25, 1988, Whitelow was living in Chicago with Ellis, his mother, and his sister. That day, he and Ellis drove to Kankakee to visit one of Ellis' friends.

After stopping at a liquor store and another home, they arrived at the home of Ellis' friend. They were told the friend had passed away, so they then drove to Thomas Hodge's home. Thomas Hodge, Theresa Hodge, and the defendant were inside the house. After a brief conversation, Whitelow, Ellis, and Theresa Hodge left and went to a liquor store. Theresa asked Whitelow if he wanted to buy some cocaine.

When Whitelow said he did not have any money, Theresa walked over to Ellis and began talking to him.

Ellis called Whitelow over and asked if he wanted some cocaine. Whitelow said he did not care. Ellis then gave Whitelow $50. Whitelow bought some gin in the store and then went outside and bought $40 of cocaine from a friend of Theresa.

Whitelow, Ellis, and Theresa returned to Hodge's home. After Theresa and Whitelow smoked the cocaine, Theresa obtained money from Ellis to buy more cocaine. She and Whitelow drove to a trailer, where she made a cocaine purchase. After they returned to Hodge's home, she cooked the cocaine in her bedroom. Whitelow smoked some of the cocaine. As he left the bedroom, the defendant entered. Whitelow did not see what the defendant did in the bedroom.

Soon thereafter, Theresa emerged and asked Ellis for money to buy more cocaine. Whitelow, Ellis, and Teresa drove to a liquor store, where Theresa purchased cocaine from a man in the parking lot. Upon their return, Theresa cooked some cocaine and told Ellis to join her in the bedroom. After about a half-hour, they came out of the bedroom. Whitelow then asked Theresa to have sex with him. She refused, saying she wanted to be with Ellis because he had money. Theresa and Ellis then went out for beer and cigarettes.

After they returned, Ellis and Whitelow decided to leave. Ellis allowed the defendant to accompany them because the defendant needed a ride to Chicago. The three first drove to a liquor store, where the defendant went inside to purchase alcohol. While he was inside, Whitelow told Ellis he did not have sex with Theresa. Ellis asked him if he wanted to go back, and Whitelow said he did not care. When the defendant came back to the car, they returned to Hodge's house. Whitelow again asked Theresa to have sex with him. She refused, but said she would the next time he came over.

Whitelow, Ellis, and the defendant returned to the car and started driving back to Chicago. Whitelow drove, while the defendant sat in the rear passenger seat with Ellis located directly in front of him. Ellis was facing Whitelow in the front seat and giving him directions when Whitelow heard a loud noise. Ellis' head first raised, and then he slumped toward Whitelow. Whitelow turned toward the defendant, who held a small gun in his hand. The defendant smiled and told Whitelow that if he did not listen to him, he would kill him as well.

After the defendant told Whitelow to make a turn, he ordered Whitelow out of the car. Whitelow refused, saying the defendant had to get out first. When Whitelow thought the defendant was out, he

accelerated, but the defendant remained in the car. The defendant grabbed Whitelow, causing him to lose control of the wheel. As they struggled, the car hit some mailboxes and a trailer. Whitelow dove into the back seat and pulled the gun away from the defendant. He threatened to shoot the defendant, but the defendant laughed and said the gun was not loaded. Whitelow pulled the trigger, but the gun did not fire.

The defendant began going through Ellis' pockets. After Whitelow told him to stop, they exchanged blows. The defendant then left the scene.

Whitelow tried to start the car, but it stalled. He walked to a residence and asked to make a telephone call. The man at the residence refused him. He then went to a hotel and asked to use the telephone. The employee refused but did give him directions to a public phone. Whitelow began walking, but returned to the hotel and asked again to use the telephone. The employee said the telephone did not dial out. Whitelow eventually found a public telephone and reported the shooting to the operator. He remained at the telephone until a police officer arrived. Whitelow told the officer a man had shot his stepfather and turned the gun over to him.

On cross-examination, Whitelow admitted he had been drinking all day. He also admitted that in his written statement to the police he did not mention he had tried three times to make a telephone call.

Theresa Hodge testified she and her two children live with her father, Thomas Hodge. On December 25, 1988, she had been drinking before Whitelow and Ellis arrived. When the defendant arrived later, he gave her his .357 magnum so her son would not be harmed by it.

At some point, Hodge left with Whitelow and Ellis to buy cocaine and liquor. Ellis gave her the money to make the purchases. After she bought the cocaine, they returned to her home. She and Whitelow then smoked the cocaine in her bedroom.

Some time later, she left with either Whitelow or Ellis to buy more cocaine. One of the two men gave her the money to purchase it. When they returned, she and Whitelow smoked it.

Theresa later left with Ellis to buy liquor. During one of the trips to the liquor store, she noticed that Ellis carried currency in large denominations as well as a small revolver.

When Whitelow and Ellis prepared to leave, the defendant asked if they would give him a ride to Chicago. Ellis said he lived on the same street as the defendant and allowed him to come along. The three left but returned briefly to have another drink. Whitelow did

not talk to Theresa at that time. After Theresa returned the defendant's gun to him, the three left for the last time.

Theresa denied having sex with any of the men. She admitted having been convicted of a crime, but could not recall if she had been convicted of either misdemeanor or felony theft.

Officer Joseph Marek testified that on the evening of December 25, 1988, he investigated an accident report. When he arrived at the scene, he saw a car which had crashed into a trailer. He then received a report that a person at a public telephone may have been involved in the accident. Marek drove to the telephone and spoke to Whitelow, who told him a man had shot his stepfather. Marek then testified to Whitelow's description of the shooting. Whitelow's description was generally consistent with the story he had given at trial, although he did not tell Marek about his three unsuccessful attempts to make a telephone call. Whitelow also handed over a pistol he said had been used in the shooting. Marek testified that Whitelow could have easily hidden the gun in the fields and woods he walked by as he looked for a telephone. Marek then transported Whitelow to the hospital for treatment of a slight head wound.

Officer Jo Fahrow spoke with Whitelow while he was in Marek's car. He appeared upset. Whitelow mentioned trying to make a telephone call at a residence and being refused, but Fahrow did not include this in her report. Fahrow then took photographs of the scene. One of the photographs showed a baseball cap found an eighth of a mile from the accident. The defendant stipulated that he owned the cap.

Melinda Greer testified she lived in the mobile home the car had run into. After the accident occurred, she went over to Linda McCrary's trailer. While McCrary called the police, a black man came up to the trailer. He said an armed man was chasing him and asked to use the telephone. After he spoke on the telephone, he ran from the trailer. She could not identify the defendant as the man who came to the trailer.

Linda McCrary testified a man came to her trailer and said someone was trying to kill him. On the man's instruction, she called the police. He took the telephone and told the police someone was trying to kill him and he was about to flee. He then left the trailer. A 14-year-old girl who was in the trailer testified the man who used the telephone identified himself as Albert Jones.

Officer Francis Hubert testified he spoke with Whitelow on the evening of the incident. He did not recall Whitelow mentioning he had

made three stops to make a telephone call. Hubert also looked through Ellis' personal effects. He found $97 but no weapons.

A pathologist who performed an autopsy on Ellis testified Ellis died of a gunshot wound to the head. The bullet entered about an inch and a half over the left ear and traveled slightly upward and to the right. The bullet came from a small weapon, such as a .25 caliber handgun. The pathologist believed that when the weapon was fired it was behind Ellis and pointed slightly upward and to the right.

A forensic scientist testified the gun Whitelow turned over to the police was a .25 caliber semi-automatic pistol. In his opinion, the bullet in the victim's head came from that weapon. Additionally, the shell casing found in the car was consistent with a .25 caliber pistol.

The defendant testified he went to the Hodges' house on December 25, 1988. Thomas Hodge, Theresa, Ellis, Whitelow, and Theresa's child were present. Because of the child, he unloaded his .357 magnum and gave it to Theresa. During the time he was there, Ellis, Whitelow, and Theresa left several times to obtain narcotics. The defendant remained and watched the child.

The defendant asked Ellis if he could have a ride to Chicago and Ellis agreed. When they left, Whitelow drove, while Ellis sat in the front passenger seat and the defendant sat directly behind him. After they went to a liquor store and purchased alcohol, they drove back to Hodge's home. Whitelow went into the bedroom with Theresa for a short time. When he emerged, they left again for Chicago. They were seated in the same positions as before.

The defendant fell into a light sleep. He awakened after hearing a loud noise and saw Whitelow pointing a gun at his face. As they struggled over the gun, Whitelow pulled the trigger. The car then hit an object and ran into a trailer. The defendant pulled Whitelow into the back seat as they continued fighting. The defendant then pushed the door open and got out of the car.

The defendant asked a girl near the trailer to call the police, but she said she did not have a telephone. He ran to another trailer and asked a woman to call the police. She had just called them, so she handed him the telephone. The defendant told the police a man had shot someone and was trying to shoot him. The defendant denied identifying himself as Albert Jones. He then ran down the road into the woods. Eventually, he obtained a ride to Chicago.

On cross-examination, the defendant admitted he did not talk to the police about the incident until seven months later. When asked to explain how his cap left the car, the defendant said it could have flown out the window. He could not remember if the car window was

open at the time, although he conceded it was cold that day. The prosecutor and the defendant also had the following exchange:

"Q. Isn't it not [*sic*] also true, sir, that as payment for driving to Chicago that you traded Mr. Ellis your .357 magnum for this gun; isn't that true?

A. No, it isn't.

Q. Didn't you pay Mr. Ellis—didn't you tell him that you would trade your .357 shiny Smith & Wesson Magnum for that gun if you drive me back to Chicago?

A. No, I didn't."

After the cause proceeded to closing arguments, the following exchanges occurred:

"[THE STATE]: Now, they would have you believe—well, let me back up a second. When you look at—when I did my opening statement, I said in essence was that this case is very simple. It's not a big jigsaw puzzle and there aren't a lot of pieces. Basically we have a defendant and we have a witness, when you get right down to it. There is [*sic*] only two possibilities.

In order to find him not guilty, you have to find and decide that [Whitelow] commited [*sic*] the murder.

[DEFENSE ATTORNEY]: Your Honor, I'm going to object to that. That's not what the law says and that's not how the jury is going to be instructed.

THE COURT: Objection is overruled.

[THE STATE]: You have to find that it's reasonable to believe that [Whitelow] committed the murder and that he's not a witness but that he was the murderer.

\* \* \*

Was this the actions [*sic*] of a witness, or was it consistent with a murderer? My religion would say, act as if you had faith—

[DEFENSE ATTORNEY]: Object to Mr. Beaumont and what his religious beliefs are in this case.

THE COURT: Overruled.

[THE STATE]: If we're to believe in justice, we need only to believe in ourselves and act with justice. That's why we're here today to act with justice. There will be justice here today. I believe there is justice in our hearts. Thank you."

Thereafter, the jury found the defendant guilty of first degree murder.

The defendant first argues on appeal that he was not proved guilty beyond a reasonable doubt. He contends that Whitelow's testimony, which served as the basis for the State's case, was incredible.

If there is conflicting testimony, the jury has the responsibility of deciding which witnesses are to be believed. (*People v. Henderson* (1974), 18 Ill. App. 3d 457, 309 N.E.2d 242.) On review of a conviction, all of the evidence must be viewed in the light most favorable to the State to determine whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267.

■ Here, there is sufficient evidence supporting the jury's determination. The pathologist opined that the weapon was behind the victim when it was fired. Consequently, the defendant's position in the back seat was consistent with his committing the crime. Whitelow immediately reported the crime, but the defendant did not talk to the authorities until seven months after the incident. Whitelow also told the police a story that was generally consistent with his testimony at trial. Furthermore, the presence of the defendant's baseball cap an eighth of a mile from the accident scene supported Whitelow's version. Whitelow testified that before the accident, he pulled over and the defendant began to get out. He then pulled away in an effort to escape the defendant, but the defendant remained in the car. The defendant could well have lost his cap at this time. Further, the jury might easily have doubted the defendant's explanation that the cap flew out the window, since it was cold and the windows were probably closed. Accordingly, we find that a rational trier of fact could have found the defendant guilty beyond a reasonable doubt.

■ The defendant next argues the prosecutor improperly cross-examined him when he asked the defendant if he had traded guns with Ellis in order to obtain a ride to Chicago. Since there was no testimony of such an exchange, the defendant argues the prosecutor improperly implied the existence of facts that were not supported by the evidence. See, *e.g., People v. Braggs* (1988), 184 Ill. App. 3d 756, 540 N.E.2d 767; *People v. Curry* (1975), 25 Ill. App. 3d 637, 323 N.E.2d 778.

We note the defendant failed to object to the question or to raise the issue in his post-trial motion. Consequently, we will only reverse if there was plain error. (*People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124.) Plain error occurs where the evidence is closely balanced or where the error was of such magnitude the defendant was denied a fair trial. *People v. Whitehead* (1987), 116 Ill. 2d 425, 508 N.E.2d 687.

Here, there was some basis for the prosecutor's questioning. The State presented evidence that prior to the trip Ellis had a small caliber gun and the defendant had a .357 magnum, but that during the trip the defendant shot Ellis with a .25 caliber handgun. Although it is true there was no evidence of an exchange of guns, we do not believe this questioning denied the defendant a fair trial. Based on our discussion of the reasonable doubt issue, we also find the evidence was not closely balanced. We therefore conclude the prosecutor did not commit plain error.

■ The defendant next argues the prosecutor misstated the law in closing argument when he said either Whitelow or the defendant had murdered Ellis, and that in order to find the defendant not guilty, the jury had to find it was reasonable to believe Whitelow committed the murder. The defendant contends the prosecutor improperly shifted to the defendant the burden of introducing evidence which created a reasonable doubt of his guilt. (See *People v. Weinstein* (1966), 35 Ill. 2d 467, 220 N.E.2d 432.) The defendant also argues the prosecutor improperly implied that in order to believe the defendant, the jury had to find Whitelow was lying. See *People v. Ferguson* (1988), 172 Ill. App. 3d 1, 526 N.E.2d 525.

The prosecutor's comments did not speak to the burdens on the parties. He merely stated the obvious: that given the evidence in this case, either Whitelow or the defendant was telling the truth about the shooting and the other was lying. Since neither the witnesses' recall nor their opportunity to observe the shooting was in dispute, the prosecutor could properly make such comments. (*People v. Smith* (1991), 209 Ill. App. 3d 1043, 568 N.E.2d 482; *People v. Thomas* (1988), 172 Ill. App. 3d 172, 526 N.E.2d 467.) We therefore find no error.

■ The defendant lastly argues the prosecutor improperly referred to his religious beliefs in closing argument. The defendant contends the prosecutor's remarks were both a personal comment about the strength of the State's case and an attempt to inflame the passions of the jury.

The prosecutor did not dwell on his religious beliefs. He merely referred to them as a prelude to exhorting the jury to act with justice. Therefore, we find no error.

The judgment of the circuit court of Kankakee County is affirmed.

Affirmed.

GORMAN and SLATER, JJ., concur.